No. 33,994

Leo Wells, Claimant, *Appellee,* v. The Eagle-Picher Mining & Smelting Company, *Appellant,* and William Swalley, Jr. (not appearing).

(85 P. 2d 22)

Opinion filed December 10, 1938.

*F. W. Boss, Marc G. Boss,* both of Columbus, and *John Campbell,* of Joplin, Mo., for the appellant.

*Sylvan Bruner,* of Pittsburg, and *Edward P. Scott,* of Joplin, Mo., for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action for workmen's compensation. The commissioner of workmen's compensation awarded compensation. On appeal to the district court this award was approved. The respondent appeals.

The workman at the time of his injury was operating a power-driven drill rig. He was drilling prospect holes on a lead and zinc mining lease. The respondent, the Eagle-Picher Mining and Smelting Company, owned this lease. It had entered into an oral contract with respondent Swalley, who owned the drill rig, to drill prospect holes on the lease in question at the rate of one dollar per foot when he completed each hole. The reason for having these holes drilled was that the company would thereby be able to ascertain what minerals were underneath the surface of the earth and, if so, just where would be the best place to sink a shaft. Respondent Swalley employed claimant to operate Swalley's drill rig in drilling these prospect holes.

On May 5, 1937, the Eagle-Picher Company was engaged in the tri-state mining district operating a number of lead and zinc mines. The work claimant was doing at the time of his injury was exploration work on the part of the Eagle-Picher Company to determine if the company would be justified in mining it. Harry J. Meade was assistant field superintendent of exploration work for the company. He looked after the lease and several other leases for the company.

The claimant testified that Mr. Meade was the field man for the company and told him how deep to drill the holes; the ones he drilled before he was injured were 340 feet deep. Mr. Meade came to the lease practically every day; the geologist for the company had already marked the places where the holes were to be drilled. Mr. Meade would measure him out when a particular hole was completed. Mr. Meade instructed him to keep a log of the hole and gave him some paper to keep it on; when he came out he would ask claimant how deep he was, and whenever he thought the hole was deep enough he would measure claimant out, and would point the location to commence drilling the next hole; he told claimant to save drill cuttings every five feet, except when he was in ore, and then to save them every two and one-half feet. Mr. Meade would

come out practically every day and look at the cuttings and ask how deep he was. Mr. Meade did not give him any orders.

He further testified that on May 5, 1937, Mr. Meade came out and measured the hole claimant was drilling and told him to move the rig over to the next location. In order to move it he had to loosen a bolt on the clutch lever, and this lever came down and struck him across the face. He continued to work there until about 10 o'clock on the morning of May 8, when the pain became so severe he had to quit. He started to town to a doctor and Swalley drove up; that Swalley said, "I don't know who their doctor is, let's go up and ask 'Bob Hartley' "; that they went to the office of Doctor Mc-Kinney and Doctor McKinney looked at his eye and gave him some pills; that later that evening Doctor McKinney took claimant to a hospital at Joplin, and on the way to Joplin he met Swalley. Claimant headed Swalley off and showed him the letter Doctor McKinney had given him sending him to Doctor Post at Joplin; that Swalley said, "That is O. K., go ahead"; that he then went to St. Johns Hospital and was treated by him; that later he met Swalley on the street and that Swalley said he would pay no doctor bills; that when he told this to Doctor Post he said that if the insurance company would not pay for the treatments to let him worry; that claimant had to be treated; that since the accident on May 5, 1937, he had recovered five checks, which he claimed were compensation checks. The last one of these payments was received on September 17, 1937. He filed his claim for compensation on September 20, 1937. The commissioner of workmen's compensation found that claimant was totally disabled for an indefinite period of time and was entitled to compensation for a period of not to exceed 415 weeks at the rate of $18 a week. The commissioner further found that the case was an extreme one and the claimant was entitled to medical and hospital expenses in an amount not to exceed $500. The award was made accordingly. On appeal to the district court the award was approved. The appeal is from that order.

The first argument of respondent is that the part of the award where not to exceed $500 was awarded claimant for medical and hospital expenses cannot stand. The allowance was based on G. S. 1935, 44-510. That statute reads in part as follows:

"(1) *Treatment and care of injured employees.* It shall be the duty of the employer to provide the services of a physician or surgeon and such medical, surgical and hospital treatment, including nursing, medicines, medical and surgical supplies, ambulance, crutches and apparatus, as may be reasonably

necessary to cure and relieve the workman from the effects of the injury; but the cost thereof shall not be more than $100, nor shall the period of time during which same are to be provided exceed sixty (60) days from date of accident: *Provided,* That in extreme cases the commission may, after proper showing, require the employer to provide medical, surgical and hospital treatment in an amount not in excess of $500: *And provided further,* That all fees and charges under this section shall be fair and reasonable, shall be subject to regulation by the commission, and shall be limited to such as are fair and reasonable for similar treatment of injured persons of a like standard of living. The commission shall have jurisdiction to hear and determine all disputes as to such charges. No employer shall be liable for any medical, surgical or hospital treatment, including nursing, medicines, medical and surgical supplies, ambulance, crutches and apparatus, nor for any physician's or surgeon's fees in excess of the amounts hereinbefore expressed. If the employer has knowledge of the accidental injury and refuses or neglects to seasonably provide the benefits herein required, the employee may provide the same for himself and the employer shall be liable for such expense subject to the limitations herein expressed: *Provided further,* That if the services of the physician or surgeon furnished as above provided are not satisfactory to the injured workman the commission may authorize the appointment of some other physician or surgeon, subject to the limitations as to total charges for the benefits in this section provided and the period over which same shall extend as hereinbefore expressed."

Respondent points out the provision that the employer shall furnish such surgical and medical expenses as are reasonably necessary, but "the cost thereof shall not be more than $100, nor shall the period of time during which same are to be provided exceed sixty (60) days from date of accident." Respondent argues that under the above language there are three limitations on the payment of surgical and hospital expenses—first, they must be in reasonable amounts; second, they must not ordinarily be in a greater amount than $100; and third, they must not be provided for a longer period than sixty days from the date of accident. The following provision providing for an allowance of $500 in extreme cases is noted, but respondent argues that there is no evidence in this record that the case is an extreme case, and further, that the sixty-day limitation applies to the extreme case as well as the ordinary case.

In the first place, the commissioner found that the case was an extreme one. The trial court approved this finding. There was some evidence introduced before the commissioner upon which such a finding could be based. Under such circumstances this court is limited in its right to review to questions of law. Where there is any substantial evidence to sustain a finding of fact made by the commissioner it will not be reviewed on appeal in this court. Further-

more, the record brought to this court on appeal is not such as would warrant this court in reviewing such a finding. There was apparently some medical testimony which was not abstracted and brought to this court.

In the second place, the sixty-day limitation does not apply to the payment for treatment in extreme cases. The plain language of the statute convinces us that such was not the intention of the legislature. Good reason leads us to this conclusion. The very circumstances which would make it necessary to allow a payment of $500 on account of the case being an extreme one might render it necessary that the treatment should extend over a longer period of time than sixty days. Nor is this necessarily a hardship on the employer. One of the theories of surgical treatment for a workman is that he may be rehabilitated so that he can go back into industry. Where payments for disability have been awarded, and subsequently the condition of the workman improves, the whole case may be re-examined with the idea of reducing or modifying the amount of the award. (G. S. 1935, 44-528.) It might very well be that an award could be reduced after such an examination as the result of treatments extended past the sixty-day period on account of the case being an extreme one. Furthermore, the award is not for $500. It was for an amount not to exceed $500. The statute provides that the charges shall be fair and reasonable, shall be subject to regulation by the commission, and shall be such as are fair and reasonable for similar treatment of injured persons of a like standard of living. It is also provided that the commissioner shall have jurisdiction to hear and determine all disputes as to such charges. A compliance with these provisions requires that the commission shall hear each case of this kind as to reasonableness of the charges. This must of necessity mean an examination other than the hearing on the question of whether or not compensation will be awarded. We hold, therefore, that the allowance of an amount not to exceed $500 was proper in this case.

Respondent next argues that the workmen's compensation act does not cover the work in which claimant was engaged. In support of this argument, respondent points out that only two persons were employed on the job where claimant was working, while the act provides that it shall not apply unless at least five people are employed. The exception in the act as to mines is noted, but respondent makes a vigorous argument that claimant was not working around a mine when he was injured.

The first section with which we are interested is G. S. 1935, 44-507. That section reads in part as follows:

". . . . this act shall apply to mines .˙ . . without regard to the number of workmen employed. . . ."

G. S. 1935, 44-508, reads in part as follows:

"(c) 'Mine' means any opening in the earth for the purpose of extracting any minerals and all underground workings, slopes, shafts, galleries, and tunnels, and other ways, cuts and openings connected therewith, including those in the course of being opened, sunk or driven, prospecting for and obtaining petroleum and natural gas and all other valuable products formed or existing beneath the earth's surface; and includes all the appurtenant structures at or about the openings of the mine and any adjoining adjacent work place where the materials from the mine is [are] prepared for use or shipment."

Our question then is whether a man operating a drill rig drilling holes on a mining lease for the purpose of ascertaining what, if any, minerals lie beneath the surface of the earth and where they lie, is working in a mine within the meaning of the statute. Respondent argues that the above statute refers only to an actual opening in the earth's surface for the purpose of taking out minerals, and that since there was no such opening here, and in fact no shaft being sunk at all, then what the claimant was doing was not mining but prospecting, and since he was not prospecting for oil and gas, but for lead and zinc, the section does not apply. We hold that this is too narrow a construction of the section. There is evidence in this record that it was the general practice of the mine operators in that district to carry on exploration work such as the claimant was doing in this case before actually starting to sink a shaft. The reason for this is clear. The information gained by drilling these holes would not only permit the operators to learn whether it would pay them to sink a mine, but gives them information as to the best place to sink it. The work was so important that the mining company had its geologist make a survey and fix where the holes should be drilled, and had its assistant superintendent of exploration keep check on the holes and watch the logs of the holes. Under such circumstances, we hold that the work of drilling these prospect holes was as much working in a mine as turning over the first spadeful of dirt in sinking the shaft. The language of the statute bears us out in this. It says " 'mine' means any opening in the earth for the purpose of extracting any minerals." The definition might very well have stopped there. It provides further, however, among other things, "and all underground workings . . . cuts and openings connected therewith." Re-

spondent argues that this means the cuts or openings must be physically connected with the opening in the earth for the purpose of extracting minerals. We have concluded, however, that the more logical construction means that the cut or "opening" must have some connection with the business of sinking the shaft. The drilling of the prospect holes was done in connection with the business of sinking a shaft for the purpose of extracting the minerals, for, in the exercise of good judgment in mining, the opening in the earth would never be made unless the prospect holes were first drilled.

Respondent argues next that the Eagle-Picher Company is not liable to claimant because he was working for Swalley, not the company. Respondent admits that should Swalley be held to be a subcontractor and the Eagle-Picher Company the principal, then the company would be liable. The section dealing with subcontracting is G. S. 1935, 44-503. That section reads as follows:

"Where any person (in this section referred to as principal) undertakes to execute any work which is a part of his trade or business or which he has contracted to perform and contracts with any other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any workman employed in the execution of the work any compensation under this act which he would have been liable to pay if that workman had been immediately employed by him; . . . This section shall not apply to any case where the accident occurred elsewhere than on, in or about the premises on which the principal has undertaken to execute work or which are otherwise under his control or management."

In this case we have seen that the Eagle-Picher Company had undertaken to operate a mine, as defined in our statutes, on the lease in question. It had contracted with Swalley to do part of this work, that of drilling the prospect holes. Claimant was a workman employed by Swalley. This is just the situation the statute was intended to cover. In *Williams v. Cities Service Gas Co.*, 139 Kan. 166, 30 P. 2d 97, the appellant was a gas company. It made a contract with a second party to dig a ditch for pipe. The workman was in the employ of the second party when he was injured. This court held the gas company as principal under the above section. To the same effect is *Purkable v. Greenland Oil Co.*, 122 Kan. 720, 253 Pac. 219. In that case a workman was killed while working on an oil derrick. He was employed by an oil derrick builder who had a contract with the oil company. This court held the oil company under the subcontracting lease.

Respondent realizes the force of these two cases, but argues that

in the former case the ditch was being dug where the gas company was actually laying pipe and the latter case the derrick was being built on a lease where the company was actually preparing to drill. We have, however, heretofore demonstrated in this opinion that drilling the holes in this case was as much operating a mine as digging a ditch was the work of transporting gas or building an oil derrick was drilling an oil well. Respondent next refers to the subdivision (d) of the section. (G. S. 1935, 44-503.) That subdivision provides as follows:

"'This section shall not apply to any case where the accident occurred elsewhere than on, in, or about the premises on which the principal has undertaken to execute work or which are otherwise under his control or management, or on, in, or about the execution of such work under his control or management.'"

Respondent argues that this provision prevents the subcontractor section from applying to this case. What we have already said of the interest in and control of the Eagle-Picher Company over this drilling is an answer to this argument. We hold that the company had undertaken to execute the work of operating a mine on this lease and the work carried on was under its control and management.

Respondent next argues that if the award made against it is sustained the record shows that it has been denied due process of law. This argument requires an examination of what happened at the hearing before the commissioner. It will be noted that the claim for compensation was made much more than ninety days after the accident. When the claim was made it referred to medical treatment as the only compensation received. Later this application was amended so as to refer to other payments of compensation. On the hearing the claimant testified to certain payments of compensation he had been paid by Swalley. Respondents argue that these payments were not paid as compensation but were the proceeds of an insurance policy for which claimant had applied and which was taken out for the benefit of claimant. As a matter of fact, if these payments be not treated as compensation then the application for compensation was not made in time. Respondent argues that to let this award stand would deprive it of its property without due process of law, because it was not permitted to show the circumstances surrounding the taking out of the policy for the benefit of the claimant.

G. S. 1935, 44-537, provides as follows:

"If the commission by and with the advice and written approval of the at-

torney general certifies that any scheme of compensation, benefit or insurance for the workmen of an employer in any employment to which this act applies, whether or not such scheme includes other employers and their workmen, provides scales or compensations not less favorable to the workmen and their dependents than the corresponding scales contained in this act; or that where the scheme provides for contributions by the workmen, the scheme confers benefits at least equivalent to those contributions, in addition to the benefits to which the workman would' have been entitled under this act or their equivalent, the employer may, while the certificate is in force, contract with any of his workmen that the provisions of his scheme shall be substituted for the provisions of this act; and thereupon the employer shall be liable only in accordance with that scheme, but, save as aforesaid, this section shall not apply, notwithstanding any contract to the contrary, made after this act becomes a law."

· It is not claimed that the policy in this case complied with the provisions of the above section. Except as provided in the above section, an employer is either under the act and subject to its terms, or he is not. It would not do to permit an employer to arrange some scheme of insurance which would provide for payments other than those provided by the terms of the act and by the making of a few payments under the scheme cause the claimant to wait until it was too late to file a claim for compensation under the act. We see no error in this record.

The judgment of the trial court is affirmed.