No. 35,909

PATTSY MAY HOLLER, Guardian of the Person and Estate of J. B. HOLLER, an Incompetent Person, *Appellee,* v. W. S. DICKEY CLAY MANUFACTURING COMPANY, and HARTFORD ACCIDENT AND INDEMNITY COMPANY, Insurance Carrier, *Appellants.*

(139 P. 2d 846)

Opinion
filed July 10, 1943.

R. L. Letton, of Pittsburg, argued the cause, and P. E. Nulton, of Pittsburg, was on the briefs for the appellants.

Sylvan Bruner and Pete Farabi, both of Pittsburg, argued the cause, and Morris Matuska, of Pittsburg, was on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, J.: This is a workmen's compensation case brought by the guardian of an insane workman, J. B. Holler (hereafter in the interest of brevity referred to as the claimant), to recover compensation.

The compensation commissioner heard the evidence, made findings and allowed compensation for one week's disability.

The claimant appealed to the district court. That court found for claimant and increased the award of the commissioner. Three of the several findings appearing in the journal entry of judgment read:

"3. That J. B. Holler received an accidental injury arising out of and in the course of his employment with the said respondent on or about the 28th day of November, 1941.

. . . . . . . . . . . . . . .

"9. That the accidental injury to the back and spine of said J. B. Holler and the consequent results of the necessary, proper and indicated medical treatment and service to J. B. Holler, by respondent's physician, Dr. C. H. Smith, M. D., resulted in said J. B. Holler's being rendered totally disabled from earning wages and performing and carrying on manual labor, as a workman and employee of the respondent and that the period of time which said J. B. Holler will be so totally disabled is indefinite and will probably exceed 415 weeks from and after December 3, 1941, the date J. B. Holler was unable to perform his work after the injury to his back and spine.

"10. That this is an extreme case and claimant is in need of medical treatment and service for his injury and disability arising therefrom and is entitled to further award of not to exceed $500 for medical care and treatment which includes the sum of $51 medical treatment and service already rendered J. B. Holler, by Dr. C. H. Smith, M. D."

The employer and insurance carrier appeal from the judgment of the district court.

A determination of the questions of law involved in this case requires an accurate and somewhat detailed summarization of the facts disclosed by the evidence.

It appears the claimant, who was a resident of California, was committed to the Camarillo State Hospital in California on Febru-

ary 15, 1939, suffering from insanity diagnosed by the authorities of that institution as maniac depressive psychosis. Except for a few months, when he was paroled to his wife, he was confined in that institution until September 21, 1940, when he escaped and was later discharged as improved due to the fact the hospital authorities had heard nothing from him for a considerable period of time. Shortly thereafter, claimant came to Kansas, and in September, 1941, after having taken and passed a physical examination, went to work for the respondent and continued to work for it until and including December 2, 1941. The type of work performed by claimant, and the wage received, from September to November 16, is not disclosed, but from the date last mentioned to December 2, 1941, he was working in respondent's yards, drawing and stacking pipe, and it is admitted received $27.68 for the week of November 16 to November 22, $25.93 for the week of November 23 to November 29, and $9.90 for the week commencing November 29 to and including December 2, 1941.

On December 18, 1941, the claimant was adjudged insane by the probate court of Crawford county and was on the 23d day of December of that year committed to the hospital for insane at Osawatomie, Kan., and since that date has never been released, discharged or paroled from such institution and there has never been any hearing for or adjudication of his restoration. On September 28, 1942, the date of the hearing before the commissioner, the claimant was present and testified as a witness on his own behalf. The mental ailment from which claimant was suffering when received at Osawatomie was diagnosed by medical experts there as schizophrenia or dementia praecox.

The foregoing is a summary of the pertinent uncontroverted facts and proceedings which we deem essential to a determination of this appeal. Other evidence pertaining to when and where the injuries alleged to have been suffered by claimant occurred, the nature and effect of such injuries and other pertinent facts which will be referred to were seriously controverted. Since many of them are essential to our purposes, such of them as we believe are required will be set forth as briefly as our consideration of the issues involved will permit.

The claimant, J. B. Holler, testified substantially as follows: While working for respondent, attempting to straighten the wheels

of a truck which was loaded with clay pipe, he slipped and fell, falling in a sitting position with the tongue resting on the top of his body; the fall jarred his back and spine and caused a lot of pain in the left side of his back and in his head; he notified respondent's office of the injury and went to Dr. C. H. Smith for treatment and was treated for his injury, continuing to work until December 2, when the doctor advised him to lay off work, which he did; his condition became worse and about noon on December 17th, after having received treatment at the doctor's office, he awoke from a short nap with a terrible pain and agony in his back and his left side, the pain extending to the base of his head; he fell to the floor on his hands and knees and could not stand on his legs; later he was taken before the probate court and sent to Osawatomie; on the date he was giving his testimony his back was still painful and sore; from the occurrence of his injury to that date he had not done any heavy work and was unable to keep up his work at the state hospital because of the condition of his back due to the injury; that the man in charge at the state hospital took him off one job because he saw he could not get along very well.

Claimant's mother testified that along about the middle or about the 20th of November he came home claiming he had hurt his back and that thereafter he continued to complain of pain from the small of his back to the back of his head and stated the pain ran up his spine to his head; that when claimant would get up he would brace himself with his hands and would walk with a limp supporting his back with his hands; during the entire fourteen months he was at her home, prior to having his back injured at the Dickey Clay Plant, he was apparently sane in every way.

Dr. C. S. Newman of Pittsburg, a physician and surgeon whose qualifications as a witness were not questioned by the respondent, testified in substance as follows: Holler was afflicted with a type of insanity known as schizophrenia, a type where the patient has lucid intervals; he had talked with and observed him before he took the witness stand and was of the opinion that on the date he testified Holler was having a lucid interval and was sufficiently in possession of his mental faculties to understand the nature of an oath and to relate the facts and circumstances of his injuries; he was competent to give testimony as a witness and would give a correct account of what he had seen, heard, felt and experienced; from his observation of him as a witness he would say he was able

to testify and understood fully the questions asked and the answers made by him.

In response to a hypothetical question detailing the history of the claimed injuries, consequences and treatment, the witness made the following answer:

"I believe that his mental condition could have been aggravated or brought about, that is, the condition of a man who had suffered from dementia praecox could be touched off by an accident and subsequent treatment as described. In my opinion his mental condition was probably brought about by his injury and subsequent treatment. I have an opinion that there is some rigidity and tenderness in the back at this time. In my opinion he had a ligamentous injury to his back at that time (time of back injury detailed in hypothetical question). The rigidity and tenderness would indicate there had been a severe injury there, in that it has persisted over this period of time. In my opinion this back condition would cause some disability for hard manual labor. I can only say that the condition probably exists for an indefinite period. Only time will tell on that. Mr. Holler's mental condition is schizophrenia, dementia praecox."

The witness further testified: Assuming claimant had received the injury that brought on the condition in his back as found by him on his physical examination, the probable length of time the injury would probably disable him from the performance of ordinary manual labor in the future would be indefinite; assuming Holler had had a lucid interval and based on the history of claimant's case, it was his opinion Holler might have gone on working if he had not had the accident and the treatment described. In response to another question as to whether or not it was possible he could have gone ahead and continued to work if he had not had the accident and injury and treatment he stated, "Yes I think it enters the realm of probability."

On cross-examination Doctor Newman testified: In his opinion and judgment on September 28, 1942, and at all times he had observed and talked with him (which was between September 26th to 28th) Holler was of sound mind; persons afflicted with schizophrenia when they were having lucid intervals were sane; outside influences such as accidents or trauma, mental or emotional upsets, had a tendency to impel individuals so afflicted over the brink and bring about recurrences of attacks; if claimant's back injury was muscle injury exclusively it should have been recovered long before the date he was testifying as a witness but if it was ligamentous it would not; treatment would be beneficial and lack of treatment

would extend the duration of the disability. As part of his cross-examination the following questions were asked and answers made:

"Q. Doctor, what is meant by this term schizophrenia? A. That is a disease of young people. It comes on usually in comparatively early life. It has different manifestations. Some of them will develop one set of symptoms and others entirely different. We have a catationic type, in which the individual loses control of their muscles—which this man evidently was not—where if you put them in a statuesque position they will stay there. Some of these patients in a hospital, you can lift an arm and go off and leave them lying there with that arm lifted, and it will stay there until it falls from exhaustion. Other types exhibit other symptoms, which are maniac at times. In fact, schizophrenia like some other diseases, simulates some of the other forms of insanity in different periods.

"Q. Now, Doctor, in answer to Mr. Bruner's question as to whether or not his mental condition could reasonably be considered as having been brought about by the alleged injuries related in his hypothetical question, was it your answer, Doctor, that his mental condition could have been aggravated or brought about by the accident and subsequent treatment? A. I think that is correct.

"Q. Then, Doctor, you are testifying that it was? A. I think I said that it probably was, in my opinion.

"Q. And you say it probably was aggravated or brought about by it? A. That is right.

"Q. And in giving that answer, Doctor, of course, that it could have been aggravated by the alleged injuries and treatment, you had in mind the history and background of a sufferer from schizophrenia? A. Yes, I think, of course, we have to make some differentiation in a lucid interval, in a condition of this kind. I think that man who had gone along over a period of many months and been going about normal work, that we will have to consider that as a different sort of a situation than a man who is still being retained in an insane asylum. I think he might well have been on the way to recovery in his former lucid interval, while it is quite possible that the lucid interval we observed in the court room here was merely a temporary thing, or a thing that would last only a short period, maybe a few days, maybe a few weeks.

"Q. In fact, Doctor, isn't it correct that a patient of the build and age of Mr. Holler, having suffered an injury of the type which Mr. Bruner has detailed to you in his hypothetical question, wouldn't you expect him to be completely recovered before this time, assuming proper treatment and assuming the injury to have occurred on November 20, 1941? A. No, I don't think we could say that. Some of these ligamentous injuries are quite persistent.

"Q. Tenderness on pressure, as you have described it, Doctor, is what is commonly known as a subject symptom, is it not? A. Well, that is debatable. I think that in small groups of muscles, particularly in the back, that it can be considered an objective symptom, because the patient can't tell definitely where you are pressing, and if he complains of pain and flinches consistently in the same place, I think it can be considered in the range of objective symptoms."

The following questions and answers appear as a part of his redirect and recross examination:

*Redirect examination:*

"Q. Now, Doctor, have you an opinion as to how long this lucid interval Mr. Holler had while he was working for this respondent from September until he was injured in November, 1941, would have continued if he had not had this accident to his back and the subsequent treatment recited in the hypothetical history? Do you have an opinion? A. Well, that interval might have gone on indefinitely or it might not; one couldn't say. It might have gone on indefinitely; for years. The schizophrenia might never have recurred."

*Recross examination:*

"Q. Doctor, you say it might have gone on indefinitely or it might not, is that right, the lucid interval? A. That is right.

"Q. And it might have recurred shortly, might it not? A. It is possible.

"Q. And taking in consideration the history of this patient, wouldn't you say that was within the realm of probability, as you expressed it, that it might recur shortly? A. Well, I would just say the history I have heard here would give no indication that it was about to recur or that it might recur soon."

During the trial Dr. S. D. E. Woods, superintendent of the State Hospital at Osawatomie, witness for respondent, testified as follows:

"Q. Now, one of the causes that could cause this condition is the effect of a shock, isn't that right, doctor, this schizophrenia paranoid type? A. I don't think it is very probable.

. . . . . . . . . . . . . . . .

"Q. Would you say it might aggravate it or activate it, Doctor? A. It might be predisposing.

"Q. These types of cases, Doctor, often times they get to the point where they can go back to civilian life and work, can they not? A. Oh, yes.

"Q. And apparently get along all right; that is, may carry on labor and work for a number of years; isn't that right, Doctor? A. Yes.

"Q. And some form of shock may come to them and they are already predisposed to that condition, and that flares it up or lights it up and puts the brain back in a bad mental state again, isn't that right? A. Just as you would refer to it as a predisposing factor; I wouldn't say it was a causing factor. We don't know the cause of functional insanity."

With respect to the meaning of the word "predisposing" the record shows testimony of Doctor Newman was as follows:

"Q. Doctor, what, in your opinion, does the term predisposing mean, in the language of medical profession to a doctor?

. . . . . . . . . . . . . . . .

"A. It means the cause or forerunner of the thing that would bring about the condition."

It should be here stated that many of the pertinent facts in the related evidence were controverted by witnesses who testified in behalf of the respondents and that as to some of such facts more than one witness disputed them. It should also be stated no attempt has been made to relate, nor have we considered, evidence adduced by appellants and which supports their version of the factual situation, since on a review of special findings of the trial court this court is concerned only with evidence which supports or tends to support the findings made and is not permitted to consider evidence unfavorable thereto. (*Smith v. Cudahy Packing Co.*, 145 Kan. 36, 40, 64 P. 2d 582; *Gallagher v. Menges & Mange Const. Co.*, 146 Kan. 506, 72 P. 2d 70; *Walker v. Finney County Water Users Ass'n*, 150 Kan. 254, 257, 92 P. 2d 11; *Williams v. Cities Service Gas Co.*, 151 Kan. 497, 499, 99 P. 2d 822, and *Mitchell v. Mitchell Drilling Co.*, 154 Kan. 117, 118, 114 P. 2d 841.)

Since the determination of appellants' principal specification of error that the award of compensation is not supported by sufficient evidence depends in part upon the question of the competency of the claimant as a witness, we first direct our attention to that subject. Appellants' claim is that a person who has been adjudged insane and at the time of his production as a witness is confined to a state hospital for the insane is an incompetent witness and in support of their contention cite G. S. 1935, 60-2805, the pertinent portions of which read:

"The following persons shall be incompetent to testify: First, persons who are of unsound mind at the time of their production for examination."

It is true, as contended by appellants, claimant was on the date of his production as a witness an inmate of a state hospital for the insane under an adjudication he was insane on the date of his hearing in the probate court. It is also true there has been no adjudication of restoration to sanity. However, it should be noted the statute does not state a person is incompetent because he is confined in an institution for the insane. It states a person is incompetent who is of unsound mind at the time of his production for examination. Doctor Newman's testimony was that Holler was experiencing a lucid interval and was sane on the day he was produced as a witness. Although neither the commissioner nor the district judge made a specific finding as to this fact, we must assume they believed that testimony, for both officials permitted him to testify, over objection of counsel, and made an award of compensation based in part upon

his evidence. We must determine whether their action in so doing was in violation of our statute.

This question was considered by this court in the recent case of *Toepffer v. Toepffer,* 151 Kan. 924, 101 P. 2d 904, wherein it was held:

"An adjudication of insanity creates a presumption of continuing insanity, but the presumption is a disputable one and may be rebutted by any competent evidence of a subsequent sound condition of mind at a particular time." (Syl. ¶ 1.)

In 28 R. C. L. 451, § 38, it is said:

"Owing to imperfect understanding of the nature of insanity, its many forms and varying effects, it was considered at common law that every insane person was wholly and absolutely *non compos mentis* and incompetent to testify. And the statement was broadly made in a number of American cases, most of which were decided in the first half of the nineteenth century, that insane persons and idiots were not competent witnesses. But in more recent times the courts, keeping pace with the progress of science, have greatly relaxed the rigor of that rule and now agree that a lunatic or a person affected with insanity is competent as a witness if he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue. Otherwise, he is not competent. In other words, a lunatic, from the condition of his mind, may not be a competent witness, but his competency on that ground, the same as want of capacity from infancy or other cause, must be determined by the court. . . ."

In 70 C. J. 91, it is stated:

"One of the tests of the competency of a witness is his intelligence and understanding, the ability truthfully and intelligently to relate the incidents within his knowledge. The test of the competency of a witness as regards his mental capacity is, in general, whether he has sufficient capacity to observe and describe correctly the facts with regard to which he is called to testify, and sufficient understanding to appreciate the nature and obligations of an oath, or, as it has been otherwise stated, the witness should have sufficient mental capacity to observe, recollect, and communicate, and some sense of moral responsibility, and the same general principles apply to mental derangement or deficiency as to mental immaturity. The competency of a mentally immature or deranged witness has been said to present questions very closely related to those involved in the matter of the credibility of a witness. The question of the mental competency of a witness is addressed largely to the discretion of the trial court, and a witness should not be debarred from testifying on the ground of mental incapacity unless the proof of such disqualification is clear and conclusive."

See, also, 70 C. J. 94, which reads:

"The witness must have an intelligent comprehension of the facts to which

he testifies. One who is so insane that he cannot give a correct or rational account of the matters which he has seen or heard with reference to the questions at issue is not a competent witness, and it may be stated generally that at common law a person *non compos mentis* is not competent to testify. The general rule is that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and be capable of giving a correct account of the matters of which he has seen or heard with reference to the questions at issue, and the same effect has been given to statutes excepting persons of 'unsound mind' from those who are competent as witnesses, or excepting 'insane persons who are in an insane condition of mind,' or providing that persons who have not the use of reason, such as idiots or lunatics during lunacy, are incompetent witnesses. . . ."

Here there was no refutation of the testimony Holler was experiencing a lucid interval, that he had sufficient understanding to comprehend the nature and obligation of an oath, and that his mental capacity was such he could understand and intelligently answer the questions which were propounded to him by counsel. We think there is nothing in our statute which makes a person incompetent as a witness under such circumstances, notwithstanding the fact he may at the time be under commitment to one of the mental hospitals of the state. If the trial court, after consideration of the testimony as to Holler's mental condition, believed he had sufficient understanding to qualify as a witness and that he was not of unsound mind at the time of his production as such, it could properly, in the exercise of its discretion, permit him to testify and give credence to his testimony.

Appellants strenuously contend the judgment of the district court awarding claimant compensation for 415 weeks is not supported by substantial competent evidence. The reply to that contention is to be found in the evidence of the claimant. The trial court found, based upon the testimony of these witnesses, that the accidental injury to the back and spine of claimant and the consequent treatment resulted in total disability and that the time of such disability was indefinite and would probably exceed 415 weeks from and after December 3, 1941.

Under G. S. 1935, 44-556, this court on appeal in compensation cases is limited to a review of "questions of law." That the question of whether a judgment in such a case is supported by substantial, competent evidence is a question of law, as distinguished from a question of fact, has been determined by this court. (*Fair v. Golden Rule Refining Co.*, 134 Kan. 623, 7 P. 2d 70; *Gallagher*

*v. Menges & Mange Const. Co.,* supra; *Williams v. Cities Service Gas Co.,* supra.) We believe an examination of the testimony referred to will convince the unprejudiced observer, as we are convinced, the finding and judgment of the trial court was sustained by an abundance of substantial and competent testimony. Having determined that question there is nothing we can do about the trial court's decision. It is not for us to say what testimony should be given credence or what evidence should be disbelieved. Under the rule often announced it is the function of the trial court, not the appellate court, to weigh conflicting evidence. (*Brown v. Olson Drilling Co.,* 155 Kan. 230, 231, 124 P. 2d 451; *Earhart v. Wible Ice & Cold Storage Co.,* 150 Kan. 695, 698, 95 P. 2d 366; *Johnson v. Voss,* 152 Kan. 586, 589, 106 P. 2d 648, and *Meredith v. Seymour Packing Co.,* 141 Kan. 244, 40 P. 2d 325.)

Nor is it of benefit to appellants, assuming but not conceding the evidence of physical disability, standing alone, was not sufficient to uphold the trial court's award, to point out that claimant was afflicted with schizophrenia or dementia praecox prior to the sustaining of his injuries. Our compensation law prescribes no standard of health for workmen and it is well settled that accidental injuries are compensable where the accident only serves to aggravate or accelerates an existing disease or intensifies the affliction. (*Carney v. Hellar,* 155 Kan. 674, 127 P. 2d 496, and *Williams v. Cities Service Gas Co.,* supra.) Insanity is a disease, and the evidence here was that the injury was the cause or the forerunner or the circumstance which aggravated and brought about the recurrence of the mental affliction of claimant shown to exist on the date of the hearing before the commissioner.

It is urged the award of $500 for medical expense is not supported by evidence. In fact, it is argued that portion of the judgment is without support or a word of testimony and there was no evidence to show the need for any further medical treatment or hospitalization. The statute (G. S. 1941 Supp. 44-510[1]) provides that in extreme cases the commissioner may after proper showing require the employer to provide medical, surgical and hospital treatment in an amount not in excess of $500. Appellants quite properly insist an allowance for medical services, etc., must be based on evidence (*Orozco v. Central Coal and Coke Co.,* 121 Kan. 690, 249 P. 604). The same rule is applicable to the finding an emergency exists. What was the evidence? The obligation to Doctor Smith for serv-

ices in the amount of $51 was conceded. Doctor Newman's testimony was that treatment would be beneficial and lack of treatment would extend the duration of the disability. The claimant was confined in a state hospital and could not be released until an adjudication of restoration or until released as improved in condition. Without further comment it can be said there was evidence upon which, as to the emergency, the finding of the court could be based. Under such circumstances this court is limited to a review of that question of law and cannot weigh the evidence (*Wells v. Eagle-Picher M. & S. Co.*, 148 Kan. 794, 797, 85 P. 2d 22). Moreover, the finding as approved, works no hardship on the appellants. One of the theories of treatment for a workman is that he may be rehabilitated so he can go back into industry, and under G. S. 1941 Supp. 44-510(1) appellants retain the right to question the reasonableness of, and the necessity for, medical services incurred in the future. We do have some difficulty with the judgment as evidenced by the journal entry. The finding was that claimant is entitled to a further award of not to exceed $500 for medical care, whereas the award is for the sum of $500 without limitation. The evidence disclosed a present obligation of but $51 for such care. The judgment as rendered is modified to comply with finding No. 10, made by the trial court. The balance of the $500 is not payable now but any treatment which is authorized under the statute, and for which the employer is liable, is properly payable when so authorized and incurred.

We find some merit in appellants' contention the trial court's finding No. 2, as to the claimant's compensation rate was erroneous, although we cannot agree with their computation as to what the rate should be. It is conceded by all parties that claimant worked from November 16, 1941, to December 2, 1941, which was the last day he worked. Also, that during that period of time he worked continuously seven days a week and his total compensation was $63.51. We believe the error of the trial court rests in the use of a total working period of sixteen days when, in fact, the claimant worked seventeen days. In any event our computation discloses claimant's average weekly earning was $26.15 and his weekly rate of compensation was $15.69. Finding No. 2, as it now appears in the journal entry should be changed to so read and the judgment should be modified accordingly.

The judgment of the trial court as modified is affirmed.