No. 36,339

WILLIAM T. JONES, *Appellee,* v. LOZIER-BRODERICK & GORDON, and EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY, *Appellants.*

(160 P. 2d 932)

Opinion filed July 7, 1945.

*James K. Cubbison,* of Kansas City, argued the cause, *Howard Payne,* of Olathe, *Blake A. Williamson, Lee Vaughan,* both of Kansas City, and *T. H. Hurtt,* of Dallas, Tex., were on the briefs for the appellants.

*Frank L. Bates,* of Kansas City, and *Robert L. Robertson,* of Kansas City, Mo., argued the cause, and *Sam Mandell,* of Kansas City, Mo., was on the briefs for the appellee.

The opinion of the court was delivered by

BURCH, J.: This is a workman's compensation case. The district court, on appeal, held in favor of the claimant on all issues. The respondent and its insurance carrier appeal and contend that the evidence was insufficient to establish that the accident arose out of and in the course of the employment or that a claim was made within the time provided by the statute or the extent of the claimant's disability.

If the first contention be sound, there is no basis for a claim being filed and the extent of the disability need not be determined. Consequently, consideration first will be given to the primary question.

The claimant was injured while on the grounds of the Sunflower Ordnance Plant, which belongs to the United States Government, and is operated by the Hercules Powder Company. The entire area of the Sunflower Ordnance Plant is approximately five miles wide and seven miles long. Thus, it will be seen that in area it is more extensive than most of the cities in Kansas.

The respondent is a contractor who was engaged in performing work in scattered places on the large tract. Many other contractors also were engaged in performing work on the premises. Under the

circumstances the respondent did not have control over conditions which existed throughout the entire area but its control necessarily was limited to the scattered places throughout the entire tract where its work was being performed. · The workmen employed by the respondent reported each day to what is referred to in the record as "time shacks." The claimant was in the employ of the respondent on October 28, 1942, as a carpenter ·helper, working out of time shack No. 10 from four o'clock in the afternoon until midnight. At the close of work on October 28, 1942, he was given a transfer slip and was informed that he was to report to work the next morning at eight o'clock at time shack No. 28. Consequently, it will be observed that the location of his work was changed and also the hours during which he was supposed to work. The exact distance between time shack No. 10 and time shack No. 28 is not shown by the record but the record does· disclose that the two were more than a mile and a half apart.

Instead of reporting on October 29 to time shack No. 28, the claimant remained at his home a day. At the time claimant was living at Linwood, Kansas, and according to his wife, he went over to the Sunflower Ordnance Plant on October 30 to try to get on the same shift on which he had been. He wanted to avoid working on the day shift because there were no cars from his town at such hours and he wouldn't be able to get back on the same hours. According to her testimony, the claimant had with him· when he left home either the transfer slip or an order for a transfer slip. According to the evidence given by the claimant, he arrived at the plant between 2:30 and 3:00 o'clock in the afternoon and the first thing he did was to go to the personnel office. The claimant further testified as follows: "I don't remember whether I saw my foreman that day or not. . . . I don't know what I was to do on the day I was injured. I had been doing this carpenter helper work for some time. By transfer slip I mean transferred to a different job. All I remember is my foreman told me to go over for my transfer slip and going over I got hurt. I was going to keep on working . . . , but I was being transferred from the job I had been doing, to another job. I don't know in what part of the grounds the personnel office was located. I don't know the number of the gate where I entered the grounds. I don't know where the administration building is or where the personnel office is with reference to the administration building. I don't know whether the personnel office is in that building. I went

to the administration building to get my transfer slip. I think I was going to a different job when I got hurt. . . . I think a quarter of a mile, or somewhere along in there . . . from the administration building. I don't know which direction it was. I was going to that other job when I got hurt, . . . As far as I remember, another car—was going around the bus and when I had to go around the bus he run into me. That's all I remember. . . . I don't remember the name of my foreman." On cross-examination he testified that his foreman told him to go to the personnel office to get a transfer slip. He further testified: "I don't know who I saw at the personnel office. My foreman had my transfer slip. As far as I know, he gave it to me at the personnel office. . . . As far as I can remember I got it at the personnel office. I had not checked in when I had the accident. I had not got my brass. All I did was go to the job, pick up the transfer slip and was on my way when I had the accident. . . . On other days I worked, before this accident I went to my time shack and got my brass. I hadn't done that on the day I got hurt. . . . I didn't see anybody except the person at the personnel office. . . ."

There was no further evidence as to how, when or where the unfortunate man was hurt. It is not claimed that the automobile which struck him belonged to the respondent or was being driven in a negligent manner in furtherance of its business enterprise. The record discloses that the claimant sustained a severe head injury which totally incapacitated him for some time and possibly has incapacitated him partially more or less ever since.

Additional explanation is necessary as to what the claimant meant by not having received his "brass" and as to the general conditions under which employees of the respondent labored. Robert H. Foster, called as a witness in behalf of the respondent, testified that during the involved period he was the chief timekeeper for the respondent and had charge of the pay rolls. He testified further that anyone desiring to enter the premises would have to go through the openings guarded by employees of Hercules Powder Company. To gain admission a man would have to show a photograph pass. The various contractors were scattered all over the entire plant area and respective employees would be relegated to one particular area to complete the work to be done and then go to another area. Each area had its own timekeeper. If a man were an employee of one of the contractors he would first go through the main gate by showing

his credentials and then walk or by some means get over to the area where such contractor was working. The next step was to report to the time shack for that area and such contractor. At the time shack the employee would show a badge that designated his number on the pay roll. Such badge, however, was not known as the brass. When an employee would go to the timekeeper's office he would show the number badge and thus disclose his pay-roll number. The timekeeper would give him a corresponding badge with a number on it. Such badges were originally made of brass and were called by that name but they were made of fiber at the time this accident occurred. Thus it will be seen that an employee's number badge was turned in when he reported to work and he was issued a brass. It follows that if the brass still was in the timekeeper's office it indicated that the man was not in attendance and not working and the employee would not receive pay for that time. If the brass was taken off and the employee checked in at the end of the shift, he was given credit for a day's work. Necessary notations were made on time reports kept by the timekeeper and the workman was paid according to the number of hours disclosed by adding the number of hours the workman had possession of his brass. The witness testified: "The claimant's pay would not start at time shack 28 until he had reported to the timekeeper there. . . . The minute he checks in at the time office his time starts right then." Insofar as the time record of the claimant was concerned, the witness testified that the company records disclosed that claimant was in attendance from four in the afternoon until twelve in the night of October 28, 1942. The record also disclosed that he was to be transferred to time office No. 28. The time sheet for the following day did not show the claimant as having reported and a search of the records failed to disclose that the claimant reported on October 30. According to the witness a workman could have presented a transfer slip to anyone in authority and such man would have told the workman where to go and his badge would have been waiting for him at the time shack designated on the transfer slip. If such a man were injured and became unable to work before he got to the time shack where the brass was located, the records would not show his appearance.

The district court, in its finding of fact No. 2, held as follows:

"On October 28th, 1942, the Claimant had been instructed by his foreman, that he had been changed to a different location on the plant area, and that

he was to report for duty at Time Shack No. 28, which was several miles from Time Shack No. 10, and in accordance with instructions from his foreman, Claimant did report for further employment on October 30th, 1942, and while proceeding from the personnel office of the Respondents, and on his way to Time Shack No. 28, under instructions from his foreman, he was hit by a car driven on a roadway of the area, and before he reached the location of Time Shack No. 28. . . ."

The opinion in the case of *Fair v. Golden Rule Refining Co.*, 134 Kan. 623, 7 P. 2d 70, written by the now Chief Justice Harvey, reads as follows:

". . . But a finding or judgment of a trial court should not, and cannot, stand unless it has some competent, substantial evidence to sustain it. This has been the ruling of this court on many occasions, though varied phraseology has been used in stating the ruling. . . . including workmen's compensation cases. . . .

"Whether a finding or judgment of a trial court is sustained by sufficient evidence—that is, substantial, competent evidence—is a question of law, as distinct from a question of fact. When this question is presented to this court it will examine the evidence solely for the purpose of determining that question. [Citing *Paul v. Skelly Oil Co.*, 134 Kan. 636, 7 P. 2d 73.] If sufficient evidence is found in the record to support the judgment of the trial court the judgment will be affirmed, so far as it relates to that point [ citing *Harrigan v. Western Coal & Min. Co.*, 133 Kan. 573, 300 Pac. 1115], but if such evidence is not found the judgment will be reversed." (p. 624.)

Later in the opinion appears this statement:

"What we mean to hold is that before a claim for compensation can be sustained there must be substantial, competent evidence to support it. Claims cannot be sustained which rest purely on conjecture, or upon abstract theories not applicable to the facts." (p. 629.)

See, also, *Whitaker v. Panhandle Eastern P. L. Co.*, 142 Kan. 314, 46 P. 2d 862; *Williams v. Cities Service Gas Co.*, 151 Kan. 497, 99 P. 2d 822; and *Hall v. Armour & Co.*, 153 Kan. 656, 113 P. 2d 145.

In the case of *McMillan v. Kansas Power & Light Co.*, 157 Kan. 385, 139 P. 2d 854, paragraph one of the syllabus reads as follows:

"In a claim for workmen's compensation the claimant has the burden of establishing, among other things, that the injury to the workman occurred as a result of an accident which arose out of and in the course of the workman's employment."

The opinion in the case of *Carney v. Hellar*, 155 Kan. 674, 127 P. 2d 496, reads as follows:

". . . The phrase 'in the course of employment,' simply means that the injury happened while the workman was at work in his employer's service. The phrase relates to the time, place and circumstances under which the ac-

cident occurred. [Citing *Cox v. Refining Co.*, 108 Kan. 320, 322, 195 Pac. 863; *Rush v. Empire Oil & Refining Co.*, 140 Kan. 198, 200, 34 P. 2d 542; *Floro v. Ticehurst*, 147 Kan. 426, 430-431, 76 P. 2d 773.] . . . The phrase 'out of employment,' points to the cause or origin of the accident and requires some causal connection between the accidental injury and the employment. [Citing *Cox v. Refining Co.*, *Rush v. Empire Oil & Refining Co.*, and *Floro v. Ticehurst*, all *supra.*]" (p. 677.)

Both elements must be present to justify recovery. (See: *Covert v. John Morrell & Co.*, 138 Kan. 592, 27 P. 2d 553; and *Repstine v. Hudson Oil Co.*, 155 Kan. 486, 126 P. 2d 225.) The pertinent statute reads as follows:

". . . (k) The words 'arising out of and in the course of employment' as used in this act shall not be construed to include injuries to the employee occurring while he is on his way to assume the duties of his employment or after leaving such duties, the proximate cause of which injury is not the employer's negligence." (G. S. 1935, 44-508.)

There is no showing in the record as to what company or companies may have been in charge of the administration building referred to in claimant's testimony and there is nothing in the record which definitely discloses what company or companies were in charge of the personnel office referred to in his testimony. Any assumption which might be indulged in as to the administration building would be based upon pure conjecture. However, the rule permitting us to construe liberally the workmen's compensation act in order to promote its purposes, might be relied upon to create an inference that the personnel office referred to was being operated by the respondent. Certainly, there would have been no occasion for the claimant to have gone to the personnel office of any other company but candor commands admission that we cannot determine actually whether there was established at the Sunflower Ordnance Plant a general personnel office operated by all of the various companies engaged in the work at such plant. If such was the case, then it can be said, however, that the respondent company probably had a part in its operation. In order to give the claimant the benefit of another reasonable inference, we will assume that the claimant talked with a foreman employed by the respondent at the personnel office and that such foreman directed him to report, for work, at time shack No. 28. We note, however, that the claimant testified that he couldn't remember whether he saw his foreman that day or not and that he didn't know whom he saw at the personnel office. However, he also testified that his foreman had his transfer slip and that as

far as the claimant knew the foreman gave it to him at the personnel office.

According to the claimant's wife, when he left his home at Linwood on the day of the accident, he had a transfer slip of some kind directing him to report to time shack No. 28. The appellants contend that consequently there was no occasion for the claimant to have gone to any personnel office; that he had been directed by his foreman when he quit work on the night of October 28 to report to time shack No. 28 the next day and that if the claimant went to the personnel office, he did so voluntarily for the purpose of getting his time shift changed back to his original shift, which began at four o'clock in the afternoon, rather than eight o'clock in the morning. Such contention is given strong support by the testimony of the claimant's wife and it should be noted that claimant had been directed on the night of October 28 to report for duty at time shack No. 28 at eight o'clock in the morning—not between 2:30 and 3:00' o'clock in the afternoon.

It is difficult for us to avoid the conclusion that the claimant was not reporting for work on the 30th, but was in fact seeking to have the hours of his employment changed. However, there appears in the record the following unexplained and contradictory testimony: "Well, I was supposed to be there before three. My foreman told me to be there before three." There is strong indication in the record that at the time the claimant was testifying, he was mentally incompetent. The hearing before the examiner for the compensation commission was continued because the examiner thought that the claimant was deranged. At a later hearing claimant's counsel stated that they would not put the claimant back on the stand and that they were satisfied to let the claimant's testimony stand. They now insist in a supplemental brief that when the claimant appeared at the second hearing represented by counsel it was proper to permit the hearing to proceed; that the claimant's rights can be properly determined in the present action and that claimant's possible incompetency was a fluctuating or temporary condition. In support thereof they cite *Holler v. Dickey Clay Mfg. Co.*, 157 Kan. 355, 139 P. 2d 846.

Such being the contention, we will assume that the claimant had regained his mental competency at the time of the second hearing and that he did not testify further solely because of advice of counsel.

Probably two plausible conclusions can be deduced from the claimant's conduct: Either he went to the personnel office for the purpose of having his shift changed, or he went to such office for the purpose of obtaining a transfer slip and being directed to the place where he was supposed to go to work. At one time in his testimony he stated that his foreman told him to go over after his transfer slip and that going over he got hurt; at another point in his testimony he stated that he got a transfer slip at the personnel office and was on his way to time shack No. 28 when he got hurt.

Regardless of the inconsistencies, one fact appears clearly established. The claimant had not reached the area of time shack No. 28 when the accident occurred. He testified: "I think I was going to a different job when I got hurt." and further: "I was going to that other job when I got hurt. . . . I had not checked in when I had the accident. I had not got my brass. All I did was go to the job, pick up the transfer slip and was on my way when I had the accident. I didn't know where the job was I was going. . .. . On other days I worked, before this accident, I went to my time shack and got my brass. I hadn't done that on the day I got hurt."

The situation is somewhat analogous to a case in which a company might have established an employment or personnel office near the center of a city. A workman might report to such a personnel office and be directed to go to an airplane company plant No. 2 and report for work or be directed to go to a certain coal mine No. 3 and so report. If, while on his way to so report for duty, he were injured in a traffic accident and such accident was incident to the general traffic hazards of the city and not to his particular employment, there ordinarily would not be any liability under the workmen's compensation law, on the part of the employer.

The circumstances in the present case are almost identical with those set forth in the opinion of this court in the case of *Harrison v. Lozier-Broderick & Gordon,* 158 Kan. 129, 145 P. 2d 147, except that in the cited case there was no evidence of the claimant having stopped at the personnel office or at the administration building or having contacted a foreman. If the claimant in this case stopped at the personnel office for the purpose of enabling him to get credentials which entitled him to go to work at time shack No. 28, the hazard incident to his employment would not be any different from the hazard of the claimant in *Harrison v. Lozier-Broderick & Gordon,* supra. In such case the claimant started walking down the road to

time shack No. 11 and on his way he was struck by a bus operated by the Hercules Powder Company, and injured. According to claimant's own testimony in the present case he had started walking down the road and was on his way to time shack No. 28. Obviously, the fact that he had stopped at the personnel office would not change the situation. Under the facts in the cited case, it was held by the examiner for the workmen's compensation commission and by the trial court, as follows:

". . . the claimant had not yet reached the place of his employment— hence the injury did not happen in the course of the employment, as it must do before the workman is entitled to compensation for his injury." (p. 131.)

This court approved the finding. From the opinion the following is quoted:

". . . The place of his employment was in the vicinity of time shack No. 11. He was on his way there. There was no relationship between the man at the gate and claimant's employer. They were employees either for the Sunflower Ordnance Works or the Hercules Powder Company. Claimant's employer was not operating the bus which struck him nor was the bus being operated for it. The respondent bore no different relationship to the road on which the bus was operating and along which claimant was walking than any of the other subcontractors who were doing work at this plant." (p. 131.)

The quoted statement applies with equal force to the present case. Counsel for the claimant vigorously insist that the present case should be distinguished from the cited case because the claimant had contacted his foreman and had been directed to report to time shack No. 28. We fail to comprehend wherein either fact changed the character or increased the hazard of his employment or enlarged the area of employment to which the claimant was on his way. No showing was made that the personnel office, the administration building or the place of the accident was in such area.

This opinion would be unduly prolonged by a discussion of the authorities cited by appellee. They were considered in the case of *Harrison v. Lozier-Broderick & Gordon,* supra, and have been reexamined carefully. As was said in the last cited case: "they are all cases where either the injury happened on the premises of the employer or while the workman was acting on business of the employer." (p. 131.) Neither situation is presented by the facts disclosed in the present case and we are unable to find in the record competent, substantial evidence upon which it can be held that the accident arose out of and in the course of the employment as such terms are limited by our statute and defined by our decisions.

The judgment of the trial court is reversed with directions to enter judgment for the appellants.

Smith, J. (dissenting): I find myself unable to agree with the conclusion reached by the majority. Briefly my views may be stated as follows: It is the duty of the commissioner of workmen's compensation and the trial court to make the findings of fact. The jurisdiction of this court on appeal is limited to questions of law. (See G. S. 1935, 44-556.)

I approve the rule followed by the majority that the judgment in a workmen's compensation case may not rest upon conjecture and speculation. There is another rule, however, which we have followed many times that where there was substantial evidence to sustain the findings of the commissioner and the trial court they will not be disturbed on appeal. The responsibility of reaching a conclusion as to the facts rests upon the trial court, and where there was any evidence from which a reasonable inference might be drawn to sustain the findings they should not be disturbed. (See *Butler v. White Eagle Oil Ref. Co.*, 140 Kan. 202, 34 P. 2d 120, and *Leamos v. Wilson & Co.*, 136 Kan. 613, 16 P. 2d 490.)

The issue of fact here was whether the injury to the workman arose out of his employment. Another way the question might be stated is—Had this claimant gone to work at the time of his injury? The situation as to the various time shacks and the use of the so-called "brass" by means of which each workman kept a record of his time is very well explained in the majority opinion.

The claimant does not claim that he had reported to the time shack where he had been accustomed to get his brass. There is some evidence, however, that he had been told by his foreman that he was to be transferred to another job that was being carried on by the same employer and that he should report to the personnel office. It was while he was on his way from the personnel office to the time shack where he was to go to work that he was injured. The trial court made such a finding of fact and it was sustained by the testimony of the workman himself. In my opinion the reasonable inference to be drawn from that testimony is that the workman had gone to a personnel office, where the personnel work of this employer was conducted, and was proceeding from that office to his new time shack when he was injured.

The majority opinion invades the province of the trial court in

drawing a different inference from the proven facts than was drawn by the trial court. The majority opinion relies on *Harrison v. Lozier-Broderick & Gordon,* 158 Kan. 129, 145 P. 2d 147, but notes the only difference between the two cases is that in the Harrison case there was no evidence that the workman had stopped at the personnel office before proceeding on to his proper time shack. In my opinion, that makes all the difference in the world between that case and the case under consideration. The fact that the workman had stopped at the personnel office at the direction of his foreman was sufficient to warrant the court in holding that his employment had begun there. I think there was sufficient evidence to warrant the court in reaching the conclusion it did reach as to the facts.