No. 29,831.

OTIS BEAL, *Appellee*, v. THE EL DORADO REFINING COMPANY and THE UNITED STATES FIDELITY & GUARANTY COMPANY, *Appellants*.

(296 Pac. 723.).

Opinion filed March 7, 1931.

F. J. *Leasure,* of El Dorado, and *Edgar Fenton,* of Kansas City, Mo., for the appellants.

L. J. *Bond,* of El Dorado, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The proceeding was one for compensation. On appeal from an award of compensation made by the compensation commissioner, the district court made an award. The employer and its insurance carrier appeal. It is quite plain from the record that the insurance carrier, rather than the refining company, is earnest in contesting the award.

On December 15, 1928, a pipe burst, and hot crude oil was thrown into claimant's face and upon his head. He suffered partial loss of sight of one eye, partial loss of hearing of both ears, and was disfigured for life. The court made the following finding relating to disfigurement:

"In addition to the specific injuries mentioned in the preceding paragraph the claimant, as a result of the hot oil being thrown on him, sustained severe burns resulting in a disfigurement of his face and scalp. The scalp burn was the deepest. It covered about one-third of his scalp, and no hair will grow in the part burned. About four-fifths of his left outer ear was burned off, and about one-fourth of his right outer ear is gone. About one-third of the left side of his face was burned and scarred, and other parts of his face were scarred, though the left side was most serious. There were burns around the mouth that made it slightly smaller. His left eyebrow is gone, and the roots of the upper eyelashes destroyed. These burned places are now red and discolored, but will get somewhat lighter in time. The skin on one side of his face is tender and more susceptible to heat and cold. The left side of his face feels slightly numb. In general it may be said that, in addition to the specific injuries mentioned in the preceding paragraph, he sustained a serious permanent disfigurement that is noticeable on casual observation. There is nothing about his disfigurement alone that would diminish his ability to perform labor, if he is able to secure employment."

At the time of the accident claimant was a fireman at the company's refinery, and was earning $29.68 a week, the week consisting of seven days. Previously claimant had scaled boilers, had worked as a pipe fitter, and had done tank-car work, and those were about the only kinds of work he had ever done. On May 16, 1929, claimant returned to work for the refining company as an oil gauger, at $150 per month, and claimant was so employed at the time of the hearing before the examiner on January 16, 1930. This work was lighter than the work he was doing when injured, and did not con-

sume full time. He was required, however, to furnish an automobile for his own use. There was no evidence showing reasonable value of use of the automobile.

The district court computed its award to June 26, 1930, and rendered judgment as follows:

"$267 for permanent partial loss of the hearing of his right ear;

"$178 for the permanent partial loss of the hearing of his left ear;

"$587.40 for the permanent partial loss of the sight of his left eye;

"For total temporary disability from the date of the injury to May 16, 1929, exclusive of the first week, or a total of twenty weeks and four days, at the rate of $17.86 per week, or a total of $366.16.

"For partial permanent disability for a period of 394 weeks and three days, beginning May 16, 1929, at the rate of $8.90 per week, of which amount there was due claimant to June 26, 1930, being 58 weeks, the amount of $516.20.

"That each and all of the above-mentioned sums, and the total thereof, are due and payable in a lump sum, toward the payment of which claimant has received $427.20, leaving a balance due claimant to June 26, 1930, the sum of $1,487.56, which amount claimant is hereby awarded as of said date, June 26, 1930, in a lump sum; that beginning with June 26, 1930, and extending for a period of 336 weeks and three days, said claimant will be and is entitled to compensation in the sum of $8.90 per week, payable weekly.

"For the award and payment of the aforesaid compensation judgment is hereby rendered in favor of claimant and against said respondent and its insurance carrier, and each of them."

The judgment for permanent partial loss of sight of the left eye is not contested.

The findings on which the judgment for permanent partial loss of hearing was based follow:

"6th. It was stipulated that the claimant had received compensation at the rate of $17.80 per week for 24 weeks, which sum was 60 per cent of his average weekly wages.

"7th. For the permanent partial loss of the hearing of the right ear the claimant is entitled to $17.80 for 15 weeks, or a total of $267. This sum is payable in a lump sum, and is due at this time.

"8th. For the permanent partial loss of the hearing of the left ear the claimant is entitled to recover $17.80 for 10 weeks, or a total of $178. This amount is due now, and is payable in a lump sum."

Impairment of hearing is a schedule injury (R. S. Supp. 44-510). Paragraphs 17, 18 and 19 of the schedule read as follows:

"(17) For the complete loss of hearing of both ears, 60 per cent of the average weekly wages during 100 weeks.

"(18) For the complete loss of hearing of one ear, 60 per cent of the average weekly wages during 25 weeks.

"(19) Permanent loss of the use of a finger, thumb, hand, arm, toe, foot or leg, or the permanent loss of the sight of an eye or the hearing of an ear, shall be equivalent to the loss thereof. For the permanent partial loss of the use of a finger, thumb, hand, arm, toe, foot or leg, or the sight of an eye or hearing of an ear, compensation shall be paid at sixty per cent (60%) of the average weekly wages, not in excess of eighteen dollars ($18) per week, during that proportion of the number of weeks in the foregoing schedule provided for loss of such finger, thumb, hand, arm, toe, foot or leg, or the sight of an eye or hearing of an ear, which the partial loss thereof bears to the total loss of a finger, thumb, hand, arm, toe, foot or leg, or the sight of an eye or hearing of an ear; but in no event shall the compensation payable hereunder for such partial loss exceed the compensation payable under the schedule for the total loss of such finger, thumb, hand, arm, toe, foot, or leg, or the sight of an eye or hearing of an ear."

It was stipulated that hearing of the right ear was impaired 30 per cent, and hearing of the left ear was impaired 20 per cent. The insurance carrier contends impairment of hearing should be computed on the basis of 25 weeks, as provided in paragraphs 18 and 19. This is not, however, a case of impairment of hearing of one ear, and then, disregarding that ear, impairment of hearing of the other ear. It is a case of permanent partial loss of hearing of both ears, and compensation should be computed on the basis of 100 weeks, under paragraphs 17 and 19. (*Honn v. Elliott*, ante, p. 454, 295 Pac. 719, superseding *Orendoc v. Kaw Steel Construction Co.*, 131 Kan. 366, 291 Pac. 952.)

Apparently the court took for the percentage of loss of hearing of both ears the average of the loss to each ear (30 per cent and 20 per cent), which equals 25 per cent; computed compensation on the basis of 25 per cent of 100 weeks, which equals 25 weeks; and then distributed the compensation, 15 weeks for the right ear and 10 weeks for the left ear. As indicated, the percentages of loss of hearing were agreed to. Since hearing of one ear was impaired 30 per cent, and hearing of the other ear was impaired 20 per cent it cannot be said that total loss of hearing was less than 25 per cent. The basis of 100 weeks was properly employed, and the distribution was not prejudicial to the insurance carrier.

The insurance carrier contends that since the workman suffered two schedule injuries, loss of sight and loss of hearing, compensation for those losses was exclusive of all other compensation, because of the provisions of paragraph 21 following the schedule, which reads:

"(21) Whenever the workman is entitled to compensation for a specific injury under the foregoing schedule, the same shall be exclusive of all other compensation except the benefits provided in paragraph 1 of this section, and no additional compensation shall be allowable or payable for either temporary or permanent disability: *Provided, however,* That the commission, arbitrator or committee may, in proper cases, allow additional compensation during the actual healing period, such period not to be more than ten (10) per cent of the total period allowed for the schedule injury in question, nor in any event for longer than fifteen (15) weeks: *Provided further,* That the return of the workman to his usual occupation shall terminate the healing period." (R. S. Supp. 44-510.)

The burns on the face and head were injuries distinct from the schedule losses of sight and hearing, and compensation was allowable under paragraph 22. The decision in the case of *Bray v. Carrothers Construction Co.,* 131 Kan. 766, 293 Pac. 504, applies, and the de-cision in the case of *Neuhaus v. Hope Engineering Co.,* 132 Kan. 72, 294 Pac. 655, does not apply.

Paragraph 22 reads as follows:

"(22) Should the employer and the employee be unable to agree upon the amount of compensation to be paid in any case of injury not covered by the schedule, the amount of compensation shall be settled according to the provisions of this act as in other cases of disagreement: *Provided, however,* In case of temporary or permanent partial disability not covered by schedule the workman shall receive during such period of temporary or permanent partial disability, not exceeding 415 weeks, 60 per cent of the difference between the amount he was earning prior to said injury as in this act provided and the amount he is able to earn after such injury in any employment, such compensation in no case to exceed eighteen dollars ($18) per week: *Provided further,* That the minimum of six dollars ($6) per week elsewhere provided in this act shall not apply to injuries covered by the provisions of this paragraph."

The insurance carrier contends compensation was not allowable under this paragraph because there is no minimum allowance, compensation is computed on difference between what claimant was earning and what he is able to earn, and claimant was demonstrably able to earn $150 per month.

There was no evidence or finding that claimant was able to earn $150 per month after he returned to work. The evidence was his employer paid him $150 per month, but did so for reasons and under conditions shown by testimony which follows.

T. A. Helling, general manager of the refining company, gave testimony abstracted as follows:

"Mr. Helling testified that the company gave claimant his present employ-ment because they wanted to take care of him, and they knew he could not keep himself and family on the amount allowed him under the compensation law. He further testified that they felt a moral obligation toward him, and that they are paying him more in his present position than they would ordi-narily pay another employee, . . ."

E. C. Anderson, plant superintendent of the refining company, gave testimony abstracted as follows:

"Mr. Beal was given work after his injury in order to take care of him. There were other men entitled to his present job, but he was employed out of a sense of responsibility because he had been a faithful and reliable em-ployee of the El Dorado Refining Company until he received his injury."

C. A. Mason, district superintendent of the refining company, gave testimony abstracted as follows:

"Mr. Mason testified that he, personally, had employed from twelve to fifteen thousand men in the past twenty years, including common laborers and other classes of skilled labor in oil-field work and including boiler firers, and that he had served as chairman of the safety-first division of the Mid-Continent Oil and Gas Association, and he fully qualified as an expert on employment of labor.

"He testified further that, in his opinion, Mr. Beal would be unable to secure employment at any kind of labor in the open labor market because of his injuries and disfigurement.

"Mr. Mason based his opinion on his own experience and observation and from conversations with other employers of labor, and from reading, and as some of his reasons for his opinion said that men who have been through an experience such as the claimant suffered are not steady and cannot be de-pended upon in emergencies. They are more susceptible, also, to illness and infection because of the condition of the wounds. Other employees object to working with an employee who has been terribly disfigured, and object to using the same drinking utensils and wash rooms. Employers also hesitate to take an employee who has a disfigurement because it is evident he has had one injury, and they know from their previous experience that such an em-ployee is more apt to have another injury than one who has never been injured."

Louis A. List qualified as an expert on labor employment, and gave testimony abstracted as follows:

"Mr. List testified that Mr. Beal would not be able to secure employment in the open market because of his disfigurement. Mr. List testified that his opinion was based upon his own personal experience and what he had read and heard from other employers of labor. He stated that employees object to working with one who has a facial disfigurement, and that the employee with the disfigurement is self-conscious, and is unable to do his work as well be-cause of that."

Early in the history of the operation of compensation legislation in this state this court held that loss of earning power may result from ineligibility to obtain work to do, as well as from inability to do procurable work (*Gorrell v. Battelle,* 93 Kan. 370, 144 Pac. 244); and that wages paid do not establish ability to earn. (*Gailey v. Manufacturing Co.,* 98 Kan. 53, 157 Pac. 431.) These principles have been applied by this court numerous times, and have the approval of the authorities generally.

The insurance carrier contends that compensation for disfigurement should not be allowed because of R. S. Supp. 44-528, which reads in part as follows:

"At any time before but not after the final payment has been made under or pursuant to any award or modification thereof agreed thereupon by the parties, it may be reviewed by the commission upon good cause shown upon the application of either party, . . . and if the commission shall find that the workman has returned to work for the same employer in whose employ he was injured or for another employer and is earning the same or higher wages than he did at the time of the accident or injury, or is gaining an income from any trade or employment which is equal to or greater than the wages he was earning at the time of the accident or injury, . . . the commission shall cancel the award and end the compensation: *Provided,* That the provisions of this section shall not apply to an award of compensation provided for in the schedule of specific injuries in section 10 of this act."

Although the claimant returned to work for the same employer at higher wages, the testimony of the employer's responsible agents was to the effect that higher wages were not paid because they were earned. Whether the phrase "gaining an income," etc., should be regarded as applying to something other than returning to work for the same employer, and as equivalent to "earning" an income, need not be determined, because the insurance carrier is not in position to invoke the quoted section. That section relates to review before final payment of an award which has been made, and the claimant here is still struggling to get an award.

The court found that claimant suffered partial disability for the remainder of his life on account of disfigurement, and that the average amount he will be able to earn is $14.84 per week, which is 50 per cent of his wages before he was injured. Compensation was awarded accordingly. The insurance carrier contends there was no evidence to sustain the finding that claimant's earnings will be $14.84 per week, and the finding is the result of speculation and conjecture.

The question is not a new one, and relates to certainty in a field in which there are no standards by which to attain certainty. Damages are allowed for pain and anguish. Amount of reparation is left in the first instance to the jury. The trial court may then approve or disapprove the verdict. This court may then approve or disapprove the action of the district court. There is no code for translating pain and anguish into terms of dollars and cents, but it is done, uniformly and continually, and must be done.

How many dollars should be allowed as damages for disfigurement?

In the case of *Smith v. Railroad Co.*, 108 Kan. 151, 194 Pac. 318, this court said respecting a verdict for $11,700:

"The skull was broken, causing a protuberance over one eye and crowding the nose over to one side, leaving the plaintiff's eyes crooked. While the amount of the verdict seems large, yet in view of the facial deformity and evidence showing that by reason of its location the disfigurement cannot be relieved by an operation, we are inclined to think the verdict should not be disturbed." (p. 158.)

In the case of *Kelley v. Hodge Transportation System*, 197 Cal. 598, a young woman had been given a verdict for $15,000. The court said:

"Evidently the facial disfigurements constitute the largest element of damages sustained by the respondent. She was a young woman—twenty-seven years of age—unmarried, and doubtless has suffered and will continue to suffer mortification and humiliation such as naturally comes to one of her sex by reason of permanent scars or blemishes upon her face. Both the jury and the trial court had ample opportunity to observe the natural features and comeliness of the respondent and the extent of the facial blemishes and disfigurements which she sustained. The court in passing upon a motion for a new trial was in a position to have reduced the damages allowed by the jury's verdict, had it, in the exercise of a sound discretion, believed the damages excessively large, but instead permitted the verdict of the jury to stand as its appraisement of the damages sustained, and we are not in a position to intelligently challenge the judgment of court and jury with nothing of a substantial character before us to support a contrary conclusion. It is true that no organs of the body were permanently disabled, so far as we are advised. No contradictory evidence was offered by the defense as to the permanent character of the scars which are the result of said injuries. Unless we are able to say that the award of damages made by the jury and sustained by the trial court was so grossly disproportionate to any compensation reasonably warranted by the facts as presented to us on appeal as to shock the sense of justice and raise at once a presumption that it was the result of passion, prejudice, or corruption, rather than an honest and sober judgment, this court may not exercise the power of revision." (p. 609.)

Disfigurement cases are collated in 1 Parmele, Damage Verdicts, pp. 355 to 372.

Similar questions arise in compensation cases. The compensation laws of some states make special provision for compensation for disfigurement. In the case of *Matter of Sweeting v. American Knife Co.*, 226 N. Y. 199, the state industrial commission made an award of $2,500 for serious facial disfigurement, under a statute which provided that—

"In case of an injury resulting in serious facial or head disfigurement the commission may, in its discretion, make such award of compensation as it may deem proper and equitable, in view of the nature of the disfigurement, but not to exceed $3,500." (p. 200.)

In the course of the opinion by Cardozo, J., it was said:

"It is of no moment that some other measure of compensation may have prevailed in the past. The constitution does not stereotype the forms of legislation. The common law gave the workman compensation for pain and suffering, as well as for loss of earnings, when the employer was at fault. The statute takes that remedy away, and substitutes insurance within prescribed limits, irrespective of fault. . . . The statute would stand, therefore, though facial disfigurement were unrelated to loss of earnings. But in truth it *is* related, and so the legislature must have found. One cannot defeat a statute by a presumption that in its enactment the truths of life have been ignored. The presumption is, on the contrary, that they have been perceived and heeded. But one of the truths of life is that serious facial disfigurement has a tendency to impair the earning power of its victims. In some callings it would rule out altogether an applicant for employment. In most it would put him at a disadvantage when placed in competition with others. . . . The mutilated face, like the mutilated arm or leg, is the capital fact upon which liability depends. The injury alone, without other proof of loss, makes out the claimant's handicap in the struggle of existence. Given the fact of injury, the commission is to assess the damages. . . . Nor does the statute become invalid because the commission has some discretion in fixing the amount. The legislature may provide for such a method of 'adjustment, determination and settlement' as it will. There is reason for the distinction which it has drawn between facial disfigurement and other injuries, though the reason is hardly our concern. Some injuries, as for instance the loss of a limb, may be so defined and classified that the appropriate compensation may with a fair average of justice be estimated in advance. But cases of disfigurement have their special problems. It is difficult, if not impossible, to define and classify the injuries. A flexible compensation makes for justice alike to employer and to workman." (pp. 201, 202.)

In the case of *Gorrell v. Battelle*, 93 Kan. 370, 144 Pac. 244, the court discussed the subject of duration of incapacity as follows:

"Under the terms of the statute the periodical payments which are the units of compensation are to be extended 'during incapacity,' not exceeding eight years. The duration of incapacity becomes, therefore, a subject for the determination of the trial court, and is to be determined in the same way as other questions of fact. The task will frequently be difficult to discharge because of the speculative nature of the subject and because of the moral factor involved, the character and ability of the injured workman. Very often the solution of the medical question of the curability or incurability of the plaintiff will not carry the court very far. Probable earning capacity in some suitable employment or business after injury must be taken into consideration in computing the amount of the payments to be awarded, and facts indicating probable future earning capacity will sometimes have a bearing upon the duration of incapacity. The trial court's observation of the plaintiff, in the course of the hearing, is likely to be especially informing. Because of these facts, and some others peculiar to the subject, a challenge of the correctness of the conclusion of the trial court respecting the duration of incapacity must necessarily be considered on appeal in the same way as other challenges of a similar nature." (p. 376.)

In this instance we have a similar problem. How much has the economic status of this disfigured man been lowered by the gruesome consequences of his injury? The statute imposes the duty of determining the question on the compensation commissioner. His determination may be reviewed by the district court with respect both to the facts and the law. This court may review the award of the district court on questions of law only. Whether a material finding is sustained by any evidence, is a question of law, but there is no sound basis for raising the question on this record.

That claimant was shockingly disfigured was indisputably proved. That disfigurement of the character he suffered will certainly handicap him greatly in procuring employment was fully proved. There was testimony based on knowledge and experience that claimant's disfigurement alone will prevent him from securing work in the open labor market. This evidence furnished sufficient data for determining degree of impairment of ability to earn wages. There is no recognized rule or standard or conventional method for determining the degree, and the office of compensation commissioner was created for the purpose of providing a discreet arbiter to form a judgment, within the limitations of the compensation act, on just such criteria. That is a part of the scheme of the act. If an appeal be taken to the district court, it is the duty of the district court to exercise its best judgment and make a definite award which seems to it to be fair, just and reasonable.

Percentage of impairment has been determined by the tribunal designated by the legislature to determine the fact. The result does not appear to this court to be unreasonable or unjust and, as in cases of like character, the court declines to interfere.

The judgment of the district court is affirmed.

HARVEY, J. (dissenting in part): In view of the fact that the workman has been employed since his injury at wages as high or higher than he received prior to the injury I cannot give my consent to that part of the award of compensation for permanent partial disability. As to the other portions of the award my views accord with those expressed in the opinion.