No. 36,375

James E. Stanley, *Appellee*, v. United Iron Works Company and The Employers Mutual Liability Insurance Company, *Appellants*.

(160 P. 2d 708)

Opinion filed July 7, 1945. ▮

*Lawrence M. Walker,* of Pittsburg, and *F. H. Richart,* of Joplin, Mo., argued the cause, and *Paul A. Clark,* of Pittsburg, was on the briefs for the appellants.

*Sylvan Bruner* and *Pete Farabi,* both of Pittsburg, argued the cause for the appellee.

The opinion of the court was delivered by

PARKER, J.: This is a workmen's compensation case. In the proceeding before the compensation commissioner the claimant was denied an award. He appealed to the district court and there prevailed. The employer and the insurance company appeal.

The issues can be simplified by immediate relation of uncontroverted facts disclosed by the record.

By stipulation at the hearing before the commissioner it was agreed that the relationship of employer and employee existed at the date of the alleged accidental injury; that the parties were governed by the Workmen's Compensation Act of Kansas; that

the average weekly wage of the claimant was $31.68; that respondent had actual notice; that written claim for compensation was made; that claimant met with an accidental injury which arose out of and in the course of claimant's employment; that medical service was furnished by the respondent; that no compensation had been paid; that the issues therein were: (1) Nature and extent of claimant's disability, if any, (2) amount of compensation due, if any.

As to the circumstances and conditions under which the claimant James E. Stanley was injured all parties agree that on January 15, 1944, while employed by respondent, United Iron Works Company, and at work on the inside of a steel tank, 7 feet in width and 6½ feet high, placing steel bands together on the inside thereof, the claimant was struck on the forehead and the left side of his face and left jaw by a metal chain which was being used to lower the steel bands into the tank. As an immediate consequence of the blow he was rendered unconscious for a period of between 15 and 20 minutes and when he recovered consciousness began to vomit.

Likewise conceded is the fact the claimant on June 26, 1926, long prior to his employment by the respondent had suffered an accident which caused complete loss of vision in his right eye.

With respect to the nature and extent of the injury suffered by claimant as a result of the accident the parties are in hopeless disagreement. They can best be revealed by reference to the testimony, which, of course, will be limited to portions of the evidence tending to support the award made by the district court under the well-established rule that we are concerned only with evidence which upholds an award, and are not permitted to speculate on whether there was other testimony which might have warranted a contrary decision (see *Proffitt v. Aldridge,* 154 Kan. 468, 472, 119 P. 2d 523; *Holler v. Dickey Clay Mfg. Co.,* 157 Kan. 355, 362, 139 P. 2d 846, and cases there cited).

On the subject to which we have just referred the claimant's testimony was in substance as follows: As far as I could tell I had no impairment in the vision of my left eye or in my hearing in either ear prior to January 15, 1944; after the accident my eyes began to blur, I couldn't see, and every time I would stoop over I would have dizzy spells; my head was hurting, my left ear was hurting and a little later on my right ear went to hurting; my head continued to hurt and I had pains across my forehead; around my left eye, down around my ear and down around the back of my neck

on the left side; those pains are still present; my left eye began to fog up on Sunday after I was hurt on Saturday; it began to turn blue and got bloodshot on Sunday, the eyeball itself was sore and it remained sore for about six weeks; there is pain at the back part of my eye which feels like it comes straight out into the ball; the pain extends back from that eye over my head and neck; the pain in my ear and eye is still there; I noticed I couldn't hear as well as I could and there seems to be more impairment in my left ear than in my right ear; the hearing in my ear became stationery about three months ago; prior to the time I got hurt I did not have any trouble at all with my hearing; I do not see as good out of my left eye since my injury and the loss of vision in it seemed to reach its maximum about three months after I was hurt and it has remained about the same since that time; I have continued to vomit from one to three times a day since the accident.

Dr. Herman E. Yazel, an eye, ear, nose and throat specialist of Kansas City, Mo., was a witness for claimant. In his deposition which was given on September 16, 1944, he made the following statements in narrative form:

"At Mr. Bruner's request I examined the eyes, ears, nose and throat of James E. Stanley on June 17, 1944. I took the man's personal family history and a statement as to his present ailments and complaints and examined his eyes, ears, nose and throat and the bones of his skull. I took an X ray and laboratory report, the X ray having been taken at Dr. Clyde Donaldson's office with his equipment and he and I examined the X ray and passed on' it and interpreted it. Claimant's Exhibit A is the X ray that Dr. Donaldson and I interpreted. It was all negative, with the exception of the external superior rim of the orbit of the left eye. There is a fracture that runs upward and outward and then inward in the malar bone, just above the anastomosis of the malar and the frontal bone. It is in the frontal bone proper and runs outward and upward.

"The right eye is blind and has been for several years and is due to an accident so the patient states. The whole fundus of the left eye has a degenerated appearance and the disk is not distinct. Vision is down 70.5 percent. His visual field is contracted 20 percent. The Eustachian tube and tympanum are normal in both ears, still he has a loss of hearing of *his* 15 percent in the right ear and 60 percent in the left ear. This is all indicative of an injury to this man's brain. There is evidence of an intracranial pressure that has pretty well run its course at this time except for the pathology that it has left behind. This could all be caused from the injury that he stated that he sustained in his history.

"I examined his eyes, ears, nose and throat again this morning and there was no change in the findings of any of them."

The following specific questions and answers also appear in the deposition as a part of his testimony:

"Q. Now, Doctor, coming to the left eye, you state about a degenerative appearance of the whole fundus, the whole fundus being of a yellow color. Did that condition disclose anything to you, as a physician and surgeon specializing in the eyes, and the margin of the optic nerve not being distinct? A. Yes.

"Q. What does that show? A. That he had some swelling of the disk due to intercranial pressure.

"Q. That is what you would call a choked disk, evidence of a choked disk of the eye? A. Yes, the swelling of the disk.

"Q. Have you an opinion whether or not that could reasonably be brought about by the type of accident or injury this claimant gave you a history of? A. Yes.

"Q. What is that opinion? A. That it could.

"Q. For near he reads Jaeger's No. 12 without glasses at 14 inches. What is normal vision, Doctor? A. Jaeger's No. 1 at 14 inches.

"Q. His vision is 20/100. What is normal vision? A. 20/20.

"Q. The vision you arrived at in the left eye of 20/100 and reading Jaeger's No. 12 at 14 inches, did you take these into account in any way in arriving at your opinion as to the percentage of impairment of vision? A. Yes, I followed the Kansas Compensation Commission bulletin on it, taking once the vision for distance and twice the vision for near and adding them together and dividing it by three. The measure was 70.5 percent."

In response to a hypothetical question relating to history of the claimant's case, his alleged injury and its consequences, Doctor Yazel answered that in his opinion the loss of vision in claimant's left eye and the loss of hearing in his right and left ears could reasonably be ascribed to the injury received by him. To a question similar in its nature he replied that in his opinion the loss of vision in the eye and the impairment of hearing in both ears was permanent in character. Replying to another question of like form he stated it was his belief the fracture (more fully described hereafter) was probably caused from the accident and injury.

Other questions and their answers read:

"Q. Is that claimant's Exhibit A the X ray that you and Doctor Donaldson interpreted of this claimant? A. Yes, sir.

"Q. Did you, in that X ray, make any findings or interpretation or the interpretation of anything other than normal in that picture? A. Yes. It was all negative, with the exception of the external superior rim of the orbit of the left eye. There is a fracture that runs upward and outward and then inward in the malar bone, just above anastomosis of the malar and the frontal bone. It is the frontal bone proper and runs outward and upward.

"Q. On which side of the face? A. On the left side of the face, the upper orbital rim.

"Q. The left eye?  A. Yes.

"Q. That is what the left eye is held in, is it Doctor?  A. Yes, sir."

On the question of consequences resulting from the injury the cross-examination of this witness is as enlightening and informative if not more so than his direct examination. For that reason we quote questions asked and answers made at length. They are:

"Q. Doctor, is it your opinion based upon your examination and knowledge of this case, taking into account any history you may have obtained from this claimant, that his entire disability is due to being struck by this chain on the left side of his head or face on January 15, 1944?

"Mr. Bruner: Do you mean except the right eye?

"Mr. Hudson: Yes, with the exception of the right eye.

"A. Including the deflected septum, which is quite possible, and confining it to the eye, ear, nose and throat, I think it positively comes from the injury. I can find no other cause for it.

"Q. Did you say 'positively' or 'possibly'?  A. I think it positively comes from that. I see no reason to doubt it.

"Q. Did you say 'positively' or 'possibly'?  A. Positively. I see no reason to doubt it.

"Q. And the condition you have found and described here, resulting in the disability to which you have testified, with the exception of the right eye, is in your opinion a direct result of trauma on January 15, 1944?  A. Yes, sir. I could find no other thing to ascribe it to.

"Q. Doctor, could the left eye disability, the loss of hearing and the man's headaches all be due to the same brain lesion in your opinion?  A. Yes, sir.

"Q. Can you tell from what area or in what area that lesion exists?  A. This appears to have been a homogeneous affair, the edema of the brain itself, however we don't have any picture of the whole skull, but the fact that this optic nerve and fundus has been degenerated as a result of pressure, it looks like the whole brain had some congestion or concussion of it.

"Q. From your examination by X-ray or physical examination, can you determine how long this degenerative process in the left eye nerve has existed? A. No, I cannot. It is apparent that it is clearing up however and it has been of several months, a few months at least.

"Q. I understood you to say there was no change in your findings based upon your examination of today and of June 17, 1944?  A. That is right. I am speaking of the first time I examined him and it appeared it was not of too old standing, just back a few months. I wouldn't want to say how long.

"Q. The degenerative process?  A. Yes. This comes on immediately after an injury. When there is a trauma to the head causing a concussion it comes on immediately and the patient complains of severe headaches, nausea and vomiting and then they begin to have some trouble with their ears and with their vision and in stooping over they fall forward and complain that their head fills up quickly and this slight congestion is the result of the change in posture, and the optic disks ordinarily begin to swell and many times they have noises in the ear, and sometimes they don't, and the hearing

gradually goes down, and that comes up to an extreme along in ten days to three weeks and starts down, and most authors in writing it up say the patient should be kept in bed about six months, meaning they think the swelling will go out of the brain in that length of time or gives them time to take care of themselves. There is very little we can do outside to remove the pressure and a patient should be hospitalized and some authorities think they should have a spinal puncture and draw off some blood and some use cathartics. There are two schools on what they think best to do about it. I would say from a few months to six months they ordinarily get in this condition and after that we expect them to stay about there.

"Q. If this man's condition is due to the blow to the head you wouldn't anticipate any greater recovery than he has already sustained? A. I think he is about stationary.

"Q. With reference to the left eye and ears, do you recommend any treatment? A. No. I think it is too late. I think the man should have been hospitalized at the time and some effort made to do a decompression to stop the pressure on the man's nerves in both the auditory and optic nerve."

Dr. Clyde O. Donaldson, an X-ray specialist, of Kansas City, Mo., also appeared as a witness for the claimant. Without detailing his testimony it will suffice to say its substance was that the claimant had a fracture of the rim of the left orbit which in his opinion could very easily have been caused from a blow such as he had received at the time he was injured.

While it is not expressly so stated it appears from the record that after all parties had adduced their evidence and rested the commissioner did not immediately announce his decision but took the case under advisement. Be that as it may, before he entered an award the claimant filed a motion to reopen the case and submit additional testimony. So far as the record discloses, the only objection made to the granting of the motion was that if the case was to be reopened it should be generally reopened with permission to the respondent and the insurance company to also offer additional evidence. We confess the record is not as complete on that subject as might be desired. At any rate, permission was granted and all the parties participated in the proceedings without further complaint as to the propriety of that procedure although it should be noted that as the new hearing progressed opposing parties repeatedly objected to the introduction of evidence tending to establish general disability on the ground the claim was originally filed and tried upon the theory the injury suffered by plaintiff was a scheduled one and in no sense based upon general disability which incapacitated him from performing the work he had been doing prior to its occurrence.

At this point in the interest of clarity it should be stated that at the first hearing no attempt was made to show the injury had caused claimant to be unable to perform the work he had been doing prior to its happening. On the contrary, his own testimony was that he had continued in his employer's service and performed all duties required by the position he was occupying.

The purpose in having the case reopened is clearly indicated in statements made by claimant's counsel to the examiner who sought to ascertain whether claimant was changing his position and basing his right to compensation on general disability instead of a scheduled injury. In response to a question, if that was the situation, counsel replied:

"Well, at that time, your Honor, if this man was working it would be a specific injury at that time; but if the conditions change then the compensation law in relation to his injury would change; that is my position."

Later he was asked, "But you are changing your position now from a schedule injury to a general disability," to which inquiry he made the following answer:

"I am taking the position, your Honor, that there is both in this case; and what I would like to do is to make my proof and then Your Honor can decide it under the law on the facts as presented."

Still later, and after all evidence had been adduced he made this statement:

"I would like to state to your Honor for the purpose of the record here, some confusion might arise in the record, that if at any previous hearing the claimant is apparently or is limiting himself or appears to be limiting himself to scheduled injuries, that claimant is in error and claimant wishes to state that he is now claiming compensation for general disability in addition to any scheduled injuries that may exist in the record and in the evidence."

Under the facts and circumstances disclosed by the record we regard questions pertaining to the right to reopen the case and evidence properly admissible, when once it was reopened, of more importance than the evidence itself. However, in order to properly dispose of the issues raised by the parties it must be referred to. Briefly summarized, although controverted, it was to the effect that after the first hearing claimant had been discharged by his employer because of his condition, that as a consequence of his discharge he was unable to secure similar employment, and that because of his then physical condition he was unable to procure or do work except at a materially decreased rate of compensation.

With the evidence in the state heretofore related the commissioner denied an award on the ground claimant's condition was not brought about by his accidental injury. On the same record the district court set aside that action and awarded compensation. The portion of its judgment with which we are concerned on appellate review reads:

"That as a direct result of said accidental injury suffered by Claimant on January 15, 1944, he received a severe injury to his head and brain which brought about the impairment of claimant's vision and hearing and which injury will probably become progressively worse as further time elapses. That as a direct result of said accidental injury suffered by the claimant on January 15, 1944, the Claimant, has now sustained a 70.5 percent permanent partial loss of sight of his left eye, for which he is entitled to 77.55 weeks compensation, and also sustained a 15 percent permanent partial loss of hearing of the right ear, and a 60 percent permanent partial loss hearing of the left ear, for which he is entitled compensation for 37.5 weeks, making a total of 115.05 weeks compensation to which claimant is now entitled. . . ."

So far as the findings of the trial court with respect to the facts are concerned it is not our function to pass upon them. Our only duty is to examine the record to ascertain if they are supported by substantial competent evidence (*Hall v. Kornfeld-Harper Well Servicing Co.*, 159 Kan. 70, 73, 151 P. 2d 688; *Holler v. Dickey Clay Mfg. Co.*, supra, and *McMillan v. Kansas Power and Light Co.*, 157 Kan. 385, 389, 139 P. 2d 854). That evidence when examined precludes any conclusion other than the one reached by the trial court, namely, that as a direct result of claimant's accidental injury his sight in one eye and his hearing in both ears were impaired to the extent found by the trial court on the date the case was submitted to the commissioner. We might add, although immaterial from our standpoint since there is no cross-appeal, we conclude by the same process claimant failed to establish that on such date the condition resulting from his injury was of such character as to entitle him to relief under G. S. 1943 Supp. 44-510(3a) (3b), providing for compensation where disability is total and permanent, temporary total or temporary partial, in character or under 44-510(22) providing for unscheduled temporary or permanent partial disability.

From what has been said resort to the statute makes it apparent that if the award is to be sustained it must be upheld on the basis G. S. 1943 Supp. 44-510(3c), providing for compensation for scheduled injuries, permits recovery. Obvious also is the fact that under the findings of the trial court determination of whether the consequences directly resulting from claimant's injury are scheduled

injuries, like the question of whether the award is supported by substantial competent evidence, is a question of law which, it may be added, is actually the crux of this appeal.

Aside from a general contention the claimant's impairments did not result from the accident, appellants' principal assignment of error is that the evidence did not justify an award for scheduled injuries. In support of their position they contend that permanent partial loss of the use of a member or organ is not a scheduled injury. Were this a case of first impression an examination of the present statute G. S. 1943 Supp. 44-510(3c) when compared with R. S. 1923, 44-510(3c), which it supplants, would lead us to a conclusion contrary to the contention made. But it is not so. This court has repeatedly passed on the question and reference to the decisions at once reveals there can no longer be any doubt as to its construction of the statute.

One of our leading cases on the subject is *Gallagher v. Menges & Mange Const. Co.*, 146 Kan. 506, 72 P. 2d 79. There the claimant had suffered the permanent loss of the use of a finger. In the opinion we said:

"Is such temporary total loss of use followed by permanent partial loss of use, compensable as a schedule injury? Respondent says it is not, but concedes this court has held otherwise, (*Hering v. San Ore Construction Co.,* 130 Kan. 70, 285 Pac. 592; *Orendoc v. Kaw Steel Construction Co.,* 131 Kan. 366, 291 Pac. 952; *Paul v. Skelly Oil Co.,* 134 Kan. 636, 7 P. 2d 73.) Respondent respectfully contends this court was wrong in so holding, and that the compensation should have been determined as provided by section 10, 3c(22), or section 10,3b. Our attention is directed to decisions from other jurisdictions where it is said a similar compensation law obtains. We have noted the decisions and concede the question is not entirely free from difficulty, but upon reconsideration we have arrived at the same conclusion reached in previous pronouncements on the subject. On the basis of the foregoing decisions the injury was not only compensable as a scheduled injury, but the amount of compensation was correctly computed. (Sec. 10, 3-c [2,19].) . . ." (p. 509.)

In *Neuhaus v. Hope Engineering Co.*, 132 Kan. 72, 294 Pac. 655, we held:

"A workman's little finger of his right hand was injured, resulting in permanent partial loss of use of the finger. The hand was not injured, but its use is permanently partially impaired. Under Laws 1927, ch. 232 (R. S. Supp. ch. 44, art. 5), the injury to the little finger was a specific schedule injury. . . ." (Syl.)

To the same effect is *Bull v. Patti Const. Co.*, 152 Kan. 618, 626, 106 P. 2d 690, where it was said:

"We shall first consider the finding claimant suffered a total temporary disability of twenty weeks' duration. He did not lose the great toe, but that he lost some of its use immediately following the accident must be, and is, conceded. He continued to have ten to fifteen percent permanent disability approximately eleven months after the accident. This was a scheduled injury. The mere fact he did some work did not deprive him of scheduled compensation for the loss of the use of his toe. (*Sauvain v. Battelle,* 100 Kan. 468, 164 Pac. 1086; *Raffaghelle v. Russell,* 103 Kan. 849, 176 Pac. 640; *Gallagher v. Menges & Mange Const. Co.,* 146 Kan. 506, 508, 72 P. 2d 79) . . ."

Other decisions recognizing the principle are, *Chamberlain v. Bowersock Mills & Power Co.,* 150 Kan. 934, 96 P. 2d 684; *Cornell v. Cities Service Gas Co.,* 138 Kan. 607, 27 P. 2d 228; *Gallivan v. Swift & Co.,* 136 Kan. 234, 14 P. 2d 665 and *Resnar v. Wilbert & Schreeb Coal Co.,* 132 Kan. 806, 297 Pac. 429. More could be cited, but we deem those referred to ample to definitely establish the proposition, that permanent partial loss of the use of members or organs listed in our workmen's compensation act are compensable as scheduled injuries, is no longer a debatable question in this state.

We do not ignore our opinion in *Consolidated Cement Co. v. Baker,* 129 Kan. 845, 284 Pac. 415, which, in passing we note, is the only one of our decisions cited by appellants as supporting their position on the specific question just reviewed. They direct our attention to an isolated statement appearing in that opinion wherein it was said that the loss of the use of a leg is not a scheduled injury. The court in that case was not dealing directly with the question here involved and we are not prepared to say whether the statement was inadvertently made or was simply wrong. Be that as it may, the language used is not in harmony with the rule announced in our other decisions and should no longer be regarded as authority for contentions similar to the one advanced by appellants in this action.

Appellants further contend that unless an accident results in an injury directly to the affected member or organ there can be no recovery for scheduled injuries. Baldly stated, their argument is that if an employee is struck on the head and is injured to the extent such injury results in partial loss of the use of a scheduled member, or if he suffers an injury to his spine which causes a permanent partial paralysis of some such member or organ, the only compensable scheduled injury is that place on the body, which comes in direct contact with the blow. We confess that to us, under findings such as we have in this case, the contention is a new and startling one. So new that we know of no case in this state where it has been urged.

The fact that the learned counsel for appellants cite no decision to support it while the equally learned counsel for appellee fail to direct our attention to one refuting it indicates to us that there are none. So startling in its significance and far reaching in effect that, in view of the language of the applicable statute, we are inclined to wonder if this is the first time anyone has had the temerity to suggest it. Is it possible the workmen's compensation act is so limited in its scope? We do not think so.

G. S. 1943 Supp. 44-510(3c), reads:

"Where disability, partial in character but permanent in quality, *results from the injury,* the injured workman shall be entitled to the compensation provided in paragraph 1 of this section, but shall not be entitled to any other or further compensation for or during the first week following the injury. Thereafter compensation shall be paid as provided in the following schedule, the average weekly wages to be computed as provided in section 44-511 of the General Statutes of 1935, and the compensation in no case to be more than eighteen dollars per week: . . ." (Emphasis supplied.)

Under all our decisions provisions of the compensation act must be liberally construed with the view of effecting its purpose (*Rupp v. Jacobs,* 149 Kan. 712, 718, 88 P. 2d 1102; *Chamberlain v. Bowersock Mills & Power Co.,* 150 Kan. 934, 944, 96 P. 2d 684; *Murphy v. I. C. U. Const. Co.,* 158 Kan. 541, 548, 148 P. 2d 771 and *Bailey v. Mosby Hotel Co.,* post, p. 258, 160 P. 2d 701, this day decided).

Note the emphasized portion of the statute just quoted. It does not restrict compensation to disability which occurs at the point of impact but includes disability which *results from the injury.* Neither does it limit it to a single consequence or condition which results from such injury. That this last statement is true is indicated by G. S. 1943 Supp. 44-510(3c-25), which reads:

"The total amount of compensation that may be allowed or awarded an injured workman for all injuries received in any one accident shall in no event exceed the compensation provided for in this act for total permanent disability."

Here the court found that as a direct result of an accidental injury to claimant's head and brain he sustained permanent partial loss of sight in one eye and hearing in both ears. The disability having resulted from the injury and to scheduled members the claimant was entitled to compensation for each under G. S. 1943 Supp., 44-510(3c-19). To hold otherwise would not only violate the rule the statute must be liberally construed but would do violence to the spirit and intent of the compensation act itself.

Another assignment of error is that the court erred in considering evidence offered by the claimant after the case had been submitted and the hearing concluded. The strict rules of the civil code are not applicable to compensation proceedings, the act is complete in itself and designed to defray the expense of additional litigation (*Souden v. Rine Drilling Co.,* 150 Kan. 239, 92 P. 2d 74). G. S. 1935, 44-523, expressly so provides and requires that the commissioner give the parties reasonable opportunity to be heard and present evidence. It contemplates that all available facts shall be brought to the attention of the commissioner before his award is made. We find nothing in the act which prohibits him from reopening a case after it has been concluded and before he makes his award. To deprive him of that right might in many cases result in additional litigation. It might even result in injustice to one of the parties. Moreover, in this case the appellants did not object to that procedure, nor do they make a showing the court considered the evidence adduced at such subsequent hearing. Even if it was considered no contention is made that its consideration prejudiced the appellants or would have changed the result. The decision, *Walz v. Missouri Pac. Rld. Co.,* 142 Kan. 164, 45 P. 2d 861, cited by appellants is not in point. In that case the claimant sought a rehearing after, not before, the rendition of the award. We conclude that under the provisions of the act the question of whether a compensation case may be reopened before rendition of an award for the purpose of receiving additional evidence as to the factual situation on which a decision is to be based rests in the sound discretion of the commissioner and that in the absence of any showing as to abuse of discretion action of such character cannot be relied on as a basis for reversal of the award.

It is next urged that the award of the district court was erroneous because it found general disability and awarded compensation for scheduled injuries. The major portion of the argument on this contention is predicated upon appellants' theory that loss of the use of a member is not a scheduled injury, which, as we have seen, is not well founded. Our attention is, however, directed to the heretofore quoted portion of the findings of the trial court and in particular the language "which injury will probably become progressively worse as further time elapses." It is suggested this phrase earmarks the findings as an award for general disability. Not so. We regard such language as mere surplusage and of little, if any, force and effect.

Certainly it does not warrant the construction which appellants place upon it.

Appellants' final contention is that even if claimant is entitled to compensation for scheduled injuries the trial court erred in computing the amount thereof. Their claim is restricted to compensation for partial loss of hearing in both of claimant's ears. That compensation for loss of sight was properly computed is conceded. It is argued the commissioner, under G. S. 1935, 44-601 and related statutes, has power to make rules and regulations and establish procedure in connection with the exercise of the authority conferred upon him in compensation matters. Quite true so long as the exercise of such powers does not conflict with provisions of the statute. It is pointed out the commissioner has provided by rule and regulation that in measuring loss of hearing the procedure recommended by the American Medical Association is to be used whenever possible. Also true, and we add quite proper for the law does not make requirement as to the manner in which partial loss of hearing is to be measured. It is further urged the commissioner by the same rules and regulations has set up a method for computation of compensation due for such injuries. Perhaps so. Reference to the rules and regulations promulgated by him would so indicate. We shall not labor the intricacies of that method of computation. It will suffice to say that if appellants' compute it correctly compensation for 15 percent loss of hearing in one ear and 60 percent in the other would entitle the claimant to compensation for practically the same number of weeks he would have been entitled to had he suffered an 80 percent loss of hearing in one ear and the hearing in the other had been unimpaired.

G. S. 1943 Supp. 44-510 (3c-19), so far as pertinent reads

". . . for the permanent partial loss of the use of a finger, . . . or the sight of an eye or the hearing of an ear, compensation shall be paid . . ., not in excess of eighteen dollars per week, during that portion of the number of weeks in the foregoing schedule provided for the loss of such finger. . . . or the sight of an eye or the hearing of an ear, which the partial loss thereof bears to the total loss of a finger, . . ., or the sight of an eye or the hearing of an ear . . ."

This court has construed the section of the statute just quoted and determined that its terms provide the method for computation of compensation for permanent partial loss of hearing in both ears as scheduled injuries. That being true no method which does not com-

ply with its requirements can be substituted, either by rule and regulation or otherwise.

In *Beal v. El Dorado Refining Co.*, 132 Kan. 666, 669, 296 Pac. 723, it was held:

"The result of the court's computation of compensation for loss of hearing of both ears is approved." (Syl. ¶ 2.)

And said:

"It was stipulated that hearing of the right ear was impaired 30 per cent, and hearing of the left ear was impaired 20 per cent. The insurance carrier contends impairment of hearing should be computed on the basis of 25 weeks, as provided in paragraphs 18 and 19. This is not, however, a case of impairment of hearing of one ear, and then, disregarding that ear, impairment of hearing of the other ear. It is a case of permanent partial loss of hearing of both ears, and compensation should be computed on the basis of 100 weeks, under paragraphs 17 and 19. (*Honn v. Elliott,* ante, p. 454, 295 Pac. 719, superseding *Orendoc v. Kaw Steel Construction Co.*, 131 Kan. 366, 291 Pac. 952).

"Apparently the court took for the percentage of loss of hearing of both ears the average of the loss to each ear (30 per cent and 20 per cent), which equals 25 per cent; computed compensation on the basis of 25 per cent of 100 weeks, which equals 25 weeks; and then distributed the compensation, 15 weeks for the right ear and 10 weeks for the left ear. As indicated, the percentages of loss of hearing were agreed to. Since hearing of one ear was impaired 30 per cent, and hearing of the other ear was impaired 20 per cent it cannot be said that total loss of hearing was less than 25 per cent. The basis of 100 weeks was properly employed, and the distribution was not prejudicial to the insurance carrier." (p. 669.)

In our opinion the method of computation approved in the decision just quoted is the one required by the statute. Reference to the trial court's findings will reveal such method was followed by it in reaching its conclusion the claimant was entitled to compensation for 37.5 weeks for his permanent partial loss of hearing in both ears. Based on that method its computation was correct and is approved.

The judgment is affirmed.