No. 37,879

WALTER W. VOCKE, *Appellant*, v. THE EAGLE-PICHER COMPANY, Self-Insurer, *Appellee.*

(215 P. 2d 185)

Opinion filed February 28, 1950.

*Sylvan Bruner* and *Morris Matuska,* both of Pittsburg, argued the cause, and *Pete Farabi* and *Don Musser,* both of Pittsburg, and *Joe L. Henbest,* of Columbus, were with them on the briefs for the appellant.

*Marc Boss,* of Columbus, argued the cause, and *A. C. Wallace, John R. Wallace,* and *Ben T. Owens,* all of Miami, Okla., and *Fred Walker,* of Columbus, were with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This is a workmen's compensation case. Respondent prevailed and the claimant appeals.

The district court found claimant was totally disabled for an indefinite and problematical period of time. Respondent contends there was strong evidence to the contrary but admits it is bound by the court's finding where, as here, there is substantial testimony to support the finding.

The trial court, however, also found:

"Claimant's disability is due to lead poisoning contracted in and arising out of and in the course of his employment with the Respondent; that same resulted in an occupational disease arising out of Claimant's employment with the Respondent in Cherokee County, Kansas, and as such does not constitute an injury by accident within the meaning of the Kansas Workmen's Compensation Act *under the evidence and record in this proceeding.*" (Our italics.)

Claimant appeals contending the disability was the result of an injury by accident. On that point respondent replies there is ample evidence in the record to support the finding of the district court and that on appeal our only concern is with evidence which supports the finding and not with evidence which is contrary thereto. That, of course, is the rule on appellate review whether compensation has been allowed or denied. (*Holler v. Dickey Clay Mfg. Co.,* 157 Kan. 355, 139 P. 2d 846, 148 A. L. R. 1131; *Pearson v. Electric Service Co.,* 166 Kan. 300, 201 P. 2d 643.)

Respondent cross-appeals from a finding of the trial court that it was not prejudiced by claimant's failure to give notice of his alleged injury within ten days as required by G. S. 1935, 44-520. We shall first consider the principal appeal. The issue on that point is whether there is substantial evidence in the record to support the court's finding claimant's disability resulted from an occupational disease arising out of and in the course of his employment rather than from an accident.

Claimant had been employed by respondent for a period of over three years. He worked in the white lead department of respondent's smelter at Galena. White lead is produced by heating lead ore in furnaces to about 1,250 degrees. The lead dust, fumes and smoke caused by this process passed through a series of round metal tubes, four to five feet in diameter, called trails. The trails extend approximately twenty feet above the furnace. At the top of the first trail is a gooseneck which allows the lead dust, fumes and smoke to enter into the second trail. At the bottom of the second trail is another gooseneck which allows these substances to enter the third tube or trail. There were about fifteen of such trails in

the series between the furnace and the bag room where the white powdered lead is finally collected in bags.

At the bottom of these trails there is a slide which may be removed to allow white lead which is deposited there to be removed into an auger which also forces the deposit to the bag room. In the process some of the white lead forms on the inside walls of the trails. Claimant's duties were to pull the slides at the bottom of the tubes to allow the deposit to drop onto the auger. Once every day he had to clean a door to the trails. Each day he was required to clean another opening on the No. 1 trail. Also every day he was required to beat on the outside walls of the trails over the furnace with a wooden maul, the latter process requiring ten or fifteen minutes.

In the middle of November, 1948, the white lead had become discolored with rust. On such occasions the trails had to be cleaned on the inside. During such cleaning process the furnaces were shut off. Entrance into the trails was had by removing a small plate door from the side of the trail, the hole being just large enough to permit a person to enter. The inside walls of the trails were cleaned with a putty knife and wire brush. Claimant was furnished and used a respirator regularly in the performance of his duties both inside and outside the trails. While in the trails claimant would work approximately one or one and a half hours at a time. When lead fell to the bottom of the trail it would increase the density of the dust with the result that claimant breathed some of the dust which got inside the respirator. After remaining in the trail for the period indicated he would come out of the trail for ten or fifteen minutes. During that period he would free the respirator and his clothing of as much lead dust as possible.

In the foregoing statement we have omitted all reference to testimony respecting claimant's inhalation or absorption of lead dust and fumes during the three year period of his employment while working outside the trails. That testimony has been omitted to avoid repetition and will be referred to presently in connection with a specific contention.

The claim for compensation was predicated on an accidental injury which it is alleged occurred on or about November 17, 1948, while claimant was cleaning trails in the lead smelter. The claim stated the nature of the injury thusly:

"Body and all parts and members thereof injured or affected by injury."

Although the claim stated claimant did not return to work after his injury on or about November 17, 1948, it is admitted he worked until December 14, 1948, as found by the court. As previously stated respondent concedes there is testimony to support the court's finding that on December 14, 1948, claimant's disability was total and of indefinite duration. We need, therefore, not narrate the testimony showing such disability.

Claimant's theory was and is that he suffered an accidental injury during the three-day period he worked in the trails. His counsel state:

"There is no evidence in the record establishing claimant's disability is due to a day to day exposure to lead dust over a long period of time which would be necessary to establish his disability as being due to any occupational disease as found by the Court."

This contention requires an examination of the record relative to his work during his three-year employment, other than in the trails, and its effect on claimant. As abstracted claimant testified in part:

"I worked for the Eagle-Picher Company for about three years and two weeks and all this employment was in the white lead department, where white lead is produced.

. . . . . . . . . . .

"*Once a day* we had to clean the door to the trails . . . and another opening on Number One Trail had to be cleaned *every day*. We cleaned out white dust pigment, by pigment I mean white lead. In cleaning these doors *every day* I would get some dust in my face, especially over the furnace and I would breathe some of this dust into my system. Also *every day* I had to beat the trail over the furnace with a wooden maul and the dust inside of the trail would fall down into the furnace and come out the doors and on the side of the doors and come up in my face. This would last for a period of ten or fifteen minutes a day and *I would breathe this dust into my body. I had been doing this for the period of time that I spent at the smelter until November of 1948.*" (Our italics.)

He also stated:

"*During the three years* that I worked at the smelter in the white lead department I would breathe this white lead dust as it flew up in my face and *it caused a burning sensation in my lungs,* and it was hot and would make me *weak and sick.*" (Our italics.)

The record further discloses claimant testified as follows:

"Q. When you would breathe it, how would you feel it, in what way would you feel it? You can't say it would affect your lungs, but how did it affect you? A. It was a kind of burning sensation.

"Q. Where was the burning sensation? A. *In my lungs.*

"Q. What else did you notice when you breathed it? A. It was so hot, and this dust is so strong it would make a person *weak, make me sick.*" (Our italics.)

The record discloses Doctor J. S. Hoffman, a witness for claimant, testified:

"It has been definitely shown that lead can be absorbed through the skin, lungs and intestinal tract. Considering *the nature of work that this patient has been doing,* especially his recent exposure in 1948, he probably absorbed lead through all of these mechanisms. Which portal of entry caused the largest absorption of lead is incidental, in as much as it is *the total amount of lead absorbed by the body that determines the amount of lead poisoning."* (Our italics.)

While the foregoing statement of Doctor Hoffman stressed claimant's recent exposure in 1948 it clearly also recognized his lead poisoning during the entire three-year period in determining the total amount of such poisoning. The same witness also recognized the fact of lead poisoning prior to the middle of November, 1948, by the following statement:

"This patient has been exposed to lead particles and fumes *over a period of three years,* including a very heavy exposure about the middle of November, 1948." (Our italics.)

A similar view was expressed by Doctor H. A. Browne, a witness for respondent, who had treated respondent's employees for many years, as follows:

"I don't think there is any question that the men at the Eagle-Picher lead plant do get affected by the lead fumes. A man that is in that atmosphere or similar atmosphere where a man has that occupation *it is just common sense to know that they are going to get some of it."* (Our italics.)

In view of the record we cannot say there was no evidence claimant suffered disability from lead poisoning in connection with his regular day-to-day employment over the three-year period. While it is true there was evidence he was exposed to a greater concentration of lead dust during a three-day period in November, 1948, we cannot say the court was compelled to believe claimant suffered total disability solely during that brief period. As indicated there is evidence to support the view claimant's disability was the result of daily lead poisoning over the entire three-year period of his employment including the three days he worked in the trails. The court found his disability resulted from occupational disease. There is evidence to support the finding.

Had the district court found lead poisoning, resulting in total disability, occurred during the three day period and constituted an accidental injury, as claimant contends, we might now be called upon by respondent to determine the question claimant presently attempts to submit, namely, whether inhalation and

absorption of lead dust and fumes in concentrated form over a three day period constitutes an accident within the meaning of the workmen's compensation act. Manifestly this court should not attempt to determine so vital a question absent a record which clearly presents that issue.

It is true, as counsel for claimant contend, there was testimony by Doctor Hoffman that, in his opinion, claimant's disability resulted from exposure to the high concentration of lead fumes during the days he worked in the trails; that the breathing of lead dust by claimant and the sequences following constituted a trauma to the body of the claimant. It is also true claimant testified he did not have his present ailments and disability prior to the days he worked in the trails. All this testimony would become highly important had the court found claimant's disability did not result from an occupational disease but from an accidental injury. The court found otherwise and, as stated, we are now concerned only with testimony which supports the finding made. The court had a right and a duty to consider all parts of the testimony of every witness and to give to each part thereof the credence and weight the court believed it deserved. For example while there was testimony by Doctor Hoffman concerning traumatic injury, as above stated, the doctor on cross-examination also testified:

"Q. It was not due to any blow to the body? A. Well, the word 'blow' is a rather broad term. If you mean by any injury to the body or damage to the body, I would say yes, there was damage to the body.

"Q. Was the damage caused by the lead poisining or was it the damage that caused the lead poisining, which? A. The damage was caused by the absorption and inhalation of the lead.

"Q. But the lead poisoning that you find was not caused by a blow to the body of any type? A. Lead poisoning is *only caused by the absorption of lead.*

"Q. It *is only caused by the absorption of lead?* A. Yes, sir." (Our italics.)

In *Holler v. Dickey Clay Mfg. Co.*, 157 Kan. 355, 139 P. 2d 846, 148 A. L. R. 1131, we again said:

"It is not for us to say what testimony should be given credence or what evidence should be disbelieved." (p. 365.)

Since there is evidence in the record which the district court could, and did, believe and which supports the finding it made, we cannot disturb the result.

In view of this necessary conclusion we need not discuss inter-

esting decisions cited by the parties pertaining to industrial diseases and accidental injuries. Nor need we treat respondent's cross-appeal.

The judgment is affirmed.