No. 47,640

Charlotte K. Deines, Claimant, *Appellee,* v. Gary Greer, d/b/a Union Station Cafe, Respondent, and United States Fidelity and Guaranty Company, Insurance Carrier, *Appellants.*

(532 P. 2d 1257)

Opinion filed March 1, 1975.

*Aubrey G. Linville,* of Clark, Mize & Linville, Chartered, of Salina, argued the cause and was on the brief for appellants.

*George E. McCullough,* of McCullough, Wareheim & LaBunker, of Topeka argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

Fatzer, C. J.: This is an appeal by a respondent employer and his insurance carrier from an award under the Workmen's Compensation Act.

The basic facts out of which this appeal arises are not in dispute, and they are summarized:

The claimant was working for the respondent, Gary Greer, as a cook in the Union Station Cafe. On March 10, 1972, the claimant

dropped an egg from the grill on which she was cooking. She reached down to clean up the egg and felt a sudden jolting pain in her back. She was immediately taken to the hospital and has been unable to work since the accident.

The claimant was a hard worker, sometimes working sixteen hours a day. She was 27 years old when the accident occurred and had been working in a restaurant since she was twelve years old. She weighed approximately 260 pounds and had carried that weight since she was in high school. She never had problems with her back before the accident, and there was no evidence of any preexisting emotional problems. In April, following her accident in March, she was standing in her home when she felt a pain like somebody stabbing her in the back and turning the knife. Her legs went out from under her and the pain has never stopped.

The claimant weighed 285 pounds in April, 1972, when she was readmitted to the hospital for treatment. At the time of her trial—April 11, 1973—she weighed 300 pounds.

The examiner entered an award in favor of the claimant based on 10 percent permanent partial disability. The award was affirmed by the director. On appeal, the district court increased the award to 415 weeks temporary total disability, and found as follows:

". . . The court finds from the medical testimony that in addition to her physical disabilities resulting from the injury she has a conversion or so-called pschosomatic overlay, which contributes to her weight problem. When last examined by Dr. Lungstrum in March of 1973 her condition was diagnosed as acute and chronic lumbosacral strain, and psychophysiological musculoskeletal reaction overlay. In other words, she begins to get a self-image of not being worth much. All she can do is lie there and complain, and her frustrations have led her to eat more, which aggravates her condition of extreme obesity, and greatly aggravates her condition. She does not have the bone structure to carry her weight, and her underlying problem is psychological, and her weight is part of that.

"The claimant never had any problem with her back prior to the injury on March 10, 1972. The court finds that she has been temporarily totally disabled and unable to engage in any gainful employment since the date of the accident to the date of hearing before the Examiner; and that her psychological and emotional problems are directly traceable to her physical injury. The claimant's obesity is of long-standing and has existed since claimant was in high school. This condition was a pre-existing physical weakness of the claimant at the time of her employment by the respondent, which the respondent accepted, as well as any emotional or psychiatric weakness. Her said disability is of a temporary nature as of this time and will be for an indefinite period in the future. . . ."

The respondent and the insurance carrier have appealed.

The appellants first contend there was no substantial evidence to support the district court's findings that claimant's psychological and emotional problems were directly traceable to her physical injury on March 10, 1972.

It will simplify the discussion of this case if we first review the rules which restrict this court's consideration of evidence on an appeal from a workman's compensation award.

The supreme court will not weigh the evidence and consider questions of fact. In considering a question of fact, the court's function is limited to a determination whether there is substantial evidence to support the district court's findings.

In *Vocke v. Eagle-Picher Co.*, 168 Kan. 708, 215 P. 2d 185, it was held:

"In a workmen's compensation case, on a review of special findings, this court is concerned only with evidence which supports or tends to support the findings made and does not consider evidence unfavorable thereto.

"The rule stated in the preceding paragraph applies with equal force whether compensation is allowed or denied.

"It is the right and duty of district courts to consider and weigh every part of a witness' testimony and to give it such credence and weight as in the court's judgment it deserves. It is not for an appellate court to say what testimony should be given credence or what evidence should be disbelieved." (Syl. ¶¶ 1, 2, 3.)

Again, in *Buck v. Beech Aircraft Corporation*, 215 Kan. 157, 523 P. 2d 697, it was held:

"The question of whether or not a disabilty of a workman is due to a personal injury by accident arising out of and in the course of the employment is a question of fact.

"In a review of the record on a question of fact this court's function is limited to a determination of whether or not the record, viewed in a light most favorable to the party prevailing below, contains substantial competent evidence to support the district court's findings." (Syl. ¶¶ 2, 3.)

The term "substantial evidence" has been defined on numerous occasions. In *Barr v. Builders, Inc.*, 179 Kan. 617, 296 P. 2d 1106, it was held:

"The jurisdiction of this court in workmen's compensation cases is specifically limited to questions of law.

"In reviewing a record to determine whether it contains substantial evidence to support the trial court's finding, this court is required to review all the evidence in the light most favorable to the prevailing party below, and if substantial evidence appears therein, such finding is conclusive and will not be disturbed on review, even though the record discloses some evidence which might warrant the trial court making a finding to the contrary.

"The term 'substantial evidence,' when applied by this court in reviewing an award under the Workmen's Compensation Act, means evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which issue tendered can be reasonably resolved." (Syl. ¶¶ 1, 2, 3.)

See, also, *Jibben v. Post & Brown Well Service*, 199 Kan. 793, 433 P. 2d 467; *Rund v. Cessna Aircraft Co.*, 213 Kan. 812, 518 P. 2d 518.

With these guidelines before the court, we review the record to determine whether there is any substantial evidence to support the district court's findings that claimant's psychological and emotional problems were directly traceable to her physical injury.

The undisputed evidence is that claimant had worked in a restaurant for fifteen years. Her back had not bothered her prior to the accident. She was able to be on her feet, lifting heavy pots and kettles for sixteen hours a day. She had not been affected by psychological or emotional problem previous to the accident. In fact, no question is raised concerning the accident itself or the circumstances attending it. The respondents simply assert that no causal connection has been established between the accident and the claimant's present problem. The point is not well taken.

Dr. Donald D. Goering, the claimant's regular physician, testifying as to the relationship between the injury, claimant's increased weight, and the psychosomatic reaction, stated:

"Q. Just one or two questions on this conversion reaction or so-called psychosomatic overlay that develops in this sort of thing. Do you have any opinion whether that has any effect on her weight, or inability to take it off, or keep putting it on? However, you might want to say it.

"A. Let me get this clear. Does this psychosomatic reaction have an effect on her weight?

"Q. Yes. Cause her to eat or gulp that has caused her to gain weight?

"A. It's very difficult to separate the thing. I have known this girl, like I say, for roughly two years, and the only time I have seen her is when she had an injury at work and got a little burn and they said 'Get there and get it treated', and she has worked very hard and I know this; but she has worked as a cook, which is a rough place for anybody who has a weight problem. But she never missed a day of work or anything until this incident. Now, since the injury she hasn't worked a day I don't believe. And she's a girl that's used to working. And she begins to get this self image as far as I'm concerned, that she isn't worth much. All she can do is lie there and gripe about it. And her frustrations have surely led her to eat more and she has a terrible tendency to be overweight to begin with. So they're related sure. But you can't say cause and effect exactly. You try to separate one from the other you can't do it.

"Q. That's what I was getting at.

"A. (Continuing) I'm sure her psychosomatic situation here to eat more and

I'm also sure the fact that she is heavy causes her to have more depression problems, so it becomes a vicious circle."

Dr. Goering also testified that on March 22, 1973, the claimant was readmitted to the hospital because of severe low back pain which was so serious she could not get out of bed. He stated,

"Her admission weight was 300½ pounds. She was also complaining about having her legs go out from under her. On examination at the time of admission, she was tender on palpation of the L-3 vertebra, and there was much tenderness in the lumbosacral area bilaterally. She complained of numbness in her entire left leg. There was no demonstrable muscle loss or weakness, and no abnormal reflexes. It was felt by me that the left leg numbness was on a conversion reaction type of basis since there is no anatomical way that the entire left leg from the toe to the hip could be numb. She was placed in bed rest and given analgesics and pelvic traction. Consultation was requested with the orthopedist of her choice, which was Dr. Lungstrum. Dr. Lungstrum recommended that she lose weight and that psychiatric consultation be obtained. This was done with Dr. Jon Holman. I don't have a copy of his consultation reports here although that is available in the hospital record. . . . He felt there was a depressive neurosis related to her disability and to the fact that she couldn't get back to going . . ."

Dr. Jack Edward Lungstrum, who treated the claimant, testified:

"Q. Doctor, Mr. Linville just asked you about assuming that this did happen on March 10th when she bent over, couldn't straighten up and they had to take her to the hospital. Now, assuming that to be true and assuming that she had never had back problems before, would we have to assume that this would be the percipitating cause of the chronic condition? We would have to assume that, would we not?

"A. Yes."

\* \* \* \* \*

"Q. Now, doctor, I want you to assume when she bent over to pick up the egg, her weight was 260 pounds. We would have to assume then that the weight didn't give her problems until she had this injury? What I mean is, the weight in itself didn't bring about this chronic condition, it was the weight plus the injury.

"A. I will agree; I will agree the weight plus the injury. I think the weight set the stage to a certain degree. Whether or not it would be the egg or a teaspoon or a sneeze or a sudden twist or a jolt of stepping wrong off a curbing, this could be the precipitating cause.

"Q. But until we had the precipitating cause injury, she did have this preexisting weight, you would have to agree that the bony structure was supporting her until this happened, wouldn't that be a fair statement?

"A. Yes, it would.

"Q. Now, Doctor, this psychophysiological musculoskeletal reaction overlay is a psychiatric diagnosis, is that correct?

"A. Yes.

"Q. And if the treating psychiatrist or the examining psychiatrist is of the

opinion that consultation would be of help, is that the type of treatment that you are recommending for her, and by that I mean Dr. Holman more or less?

"A. Well, a qualified psychiatrist, in my opinion, should see and probably treat this patient.

"Q. Now, when we get into this problem of this psychiatric problem, everything adds up in a bundle, doesn't it, the injury contributes to the psychiatric problem, the psychiatric problem causes her to gain more weight, and we end up in a vicious circle without proper therapy to lose weight; would that be a fair statement?

"A. Yes."

It would be well to note here that in *Berger v. Hahner, Foreman & Cale, Inc.*, 211 Kan. 541, 506 P. 2d 1175, it was held:

"When a primary injury under the Workmen's Compensation Act is shown to have arisen out of the course of employment every natural consequence that flows from the injury, including a new and distinct injury, is compensable if it is a direct and natural result of a primary injury. (Following *Jackson v. Stevens Well Service*, 208 Kan. 637, Syl. ¶ 1, 493 P. 2d 264.)

"Traumatic neurosis following physical injury, and shown to be directly traceable to such injury, is compensable under the Workmen's Compensation Act." (Syl. ¶¶ 1, 2.)

We deem it unnecessary to pursue the appellants' contention further. The district court's conclusion that the claimant's disability was directly related to the accidental injury was supported by substantial evidence.

The appellants further contend there was no substantial evidence to support the district court's finding that the claimant was temporarily totally disabled for a period of up to 415 weeks. The point is not well taken. We again touch on the evidence.

The claimant testified as to her temporary total disability as follows:

"Q. (Mr. McCullough) Have you ever been able to go back to work?

"A. No, sir.

"Q. Tell the Examiner why not.

"A. Well, I still have terrible pain in my back and my legs go out from under me.

"Q. When did your legs start going out from under you?

"A. Well, I didn't notice it until in April, but it was happening in March. The thing is, in March I was sitting around more but I would feel the knife pain but I would always be sitting down and then in April, I was up one day—

"Q. That is right after the accident?

"A. Yeah.

"Q. In 1972?

"A. Yes.

"Q. Go ahead.

"A. And in April then I was up one day and I was standing on the floor

and just like somebody stabbing a knife in my back and turning it, and my legs went out from under me and after that, it has never stopped."

Dr. Goering testified that the claimant will need treatment for an indefinite period of time and that she would not be able to return to work for an indefinite period.

"Q. Will this treatment be for an indefinite period of time?

"A. At this point I would say yes.

"Q. And the fact of her inability to return to work, is that indefinite at this time as to when she may be able to, or are you recommending she get out of that altogether, and re-train?

"A. I think the recommendation at rehab, were that she try to return to work for something else. Her problem now is her backache is so bad she couldn't go to Brown-Mackie. . . . It happens to have a flight of stairs of approximately 30 steps and she felt that her backache was so bad that she couldn't go to school. This is where she is now. I am hopeful that maybe we can get somewhere further, but in the past back exercises and back care haven't resulted in any improvement, so I don't know what the long-term outlook is."

The record contains ample evidence to support the district court's finding of temporary total disability for a period of 415 weeks.

What has been said renders unnecessary a discussion of the other issues raised by the appellants.

The judgment is affirmed.